THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
ROBERT FORD, JR., Defendant-Appellant.

Fourth District   No. 4—90—0474

Opinion filed November 7, 1991.

Daniel D. Yuhas and Arden J. Lang, both of State Appellate Defender's Office, of Springfield, for appellant.

Thomas J. Difanis, State's Attorney, of Urbana (Kenneth R. Boyle, Robert J. Biderman, and Denise M. Ambrose, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE McCULLOUGH delivered the opinion of the court:

Defendant was convicted of intentional homicide of an unborn child (the fetal homicide statute) (Ill. Rev. Stat. 1989, ch. 38, par. 9—1.2) following a bench trial in Champaign County, Illinois. Defendant was found to have stomped or kicked the stomach of his 17-year-old stepdaughter who was 5½ months pregnant, thereby causing the death of her unborn child. Defendant was sentenced to 20 years' imprisonment and he now appeals, contending (1) the fetal homicide statute violates the equal protection and due process clauses of the United States Constitution, and (2) the evidence was insufficient to prove him guilty beyond a reasonable doubt of intentional homicide of an unborn child. We affirm.

## I. Occurrence Witnesses

Defendant lived with his wife, Mary Marion, and her two daughters, Karonda Marion and Gwendalyn Fabre Jenkins. Karonda testified that on September 17, 1989, she got out of bed around 11 or 12 p.m. At that time, she, her mother, defendant, and a neighbor were present in the home. The neighbor, Lynn Simpson, took her mother to the grocery store. Karonda testified defendant was in a good mood and had not been drinking alcohol. Mary and Simpson returned home and then defendant and Simpson left to go to purchase alcohol. Karonda testified defendant returned home with hard liquor and beer. Defendant drank the alcohol and subsequently his mood changed.

An argument ensued between defendant and Karonda regarding defendant's treatment of Mary. Karonda began to cry and told her mother she felt sorry for her because of the way defendant treated her. Karonda and defendant began to have words but Mary told Karonda to shut up. Defendant said that he would "kick that bastard

out of her (Karonda's) stomach" and he then asked Simpson to take him away before he killed somebody. Thereafter, Simpson and defendant left.

At approximately 6 p.m., Karonda was in the bathroom getting ready to go out when defendant returned home. Defendant slammed the door as he entered the house and then proceeded into the master bedroom. Karonda testified the next thing she heard was her mother yell "Ow!" Karonda testified she entered the bedroom to defend her mother but denied having any weapon in her hand when she entered the bedroom.

Monica Bradley, Robert Steven Mason, and Michael Harrington were in the master bedroom with Mary and defendant. Karonda testified defendant threatened to slit her throat and kick the baby out of her stomach. Karonda testified the first thing defendant did was kick her and then she felt him grab her and cut her wrist. Karonda fell to the ground as a result of defendant's kicking her in the stomach. The rest of the people in the room were gathered around Karonda trying to get defendant away from her. Karonda testified she saw a steak knife on the floor, picked it up and stabbed defendant in his chest. After she stabbed him, defendant left the house. Karonda testified defendant kicked her three times in the stomach, and when she fell to the floor, he began stomping on her stomach.

Defendant attempted to reenter the house but Mary refused to let him in. He then went to the back door and burst in swinging a bumper jack. Karonda got a carving knife from the drawer in the kitchen and she testified she intended to kill defendant if she was able to do so. Mary took the knife from Karonda, and then defendant left the house when the police arrived. Karonda first began to feel pain in her stomach at this time. The next thing she remembered was being placed in an ambulance and taken to Mercy Hospital in Champaign. Karonda had a cut on her wrist that had been bandaged by the paramedics.

Karonda testified that while she was in the emergency room at Mercy Hospital the nurses found a fetal heartbeat using an ultrasound machine. Karonda was familiar with this process since her obstetrician had done an ultrasound earlier in her pregnancy. Karonda was also familiar with the sound of the fetal heartbeat as she had heard it before on previous medical visits. She testified the heartbeat was weaker than she had heard it before. She felt the baby kick once while in the emergency room.

Approximately a half hour after being taken into the emergency room, a sonogram was performed on Karonda. After the process was

completed, the doctor came into the room and told Karonda there was no fetal heartbeat and that her baby was dead. Karonda was admitted to the hospital, and on September 19 at 5:31 p.m. she gave birth to a dead fetus.

Karonda testified as to an incident which occurred between herself and defendant on August 17, 1989. Karonda testified defendant had been drinking alcohol that day and started an argument with Karonda's uncle, Arthur Lynn Fuller. Karonda told defendant to leave Fuller alone and defendant threatened to "knock that baby bastard and bust my (Karonda's) head in." At the time of this threat, defendant was swinging a pool cue and tapping his hand with it. Karonda told defendant he was not going to kick her and then got a knife out of the kitchen drawer. Defendant ran outside and Karonda followed him. A fight started and defendant twisted the knife out of Karonda's arm after she had cut him. Defendant then proceeded to "body slam" Karonda to the ground twice. Karonda's sister, Gwendalyn, then stopped defendant from any further physical contact with Karonda. Karonda denied having any problems with her pregnancy as a result of this incident. She further denied having abdominal pain or vaginal bleeding or discharge. Karonda did not visit her doctor between August 17, 1989, and September 17, 1989. She testified she felt the baby move on various days between August 17 and September 17, 1989, although she testified the baby did not move every day.

On cross-examination, Karonda admitted she quit taking the prenatal vitamins prescribed by her doctor because they made her sick to her stomach; however, she denied she also quit taking her iron pills. As to the August 17, 1989, incident, Karonda testified that after defendant took the first knife away and "body slammed" her to the ground, she ran into the house and got another knife. Karonda reaffirmed she felt the baby kick in the emergency room.

Mary testified she was in the bedroom with Monica Bradley, Robert Steven Mason, and Michael Harrington when defendant returned home on September 17, 1989. Mary and defendant began arguing about the number of people present in the bedroom. Defendant then went crazy and started throwing Mary's medicine, which was on the dresser, into the garbage. Defendant scooped up all of the medicine on two separate occasions and attempted to throw it away. Mary retrieved it from the trash on both occasions. The third time he attempted to grab the medicine, Mary grabbed his shirt. Defendant was holding a cigarette at the time and he reached out and burned Mary in the chest. Mary cried out in pain and began hitting defendant. Karonda came into the bedroom and told defendant to leave Mary

alone. Mary testified Karonda had nothing in her hands when she entered the bedroom.

Mary testified she told Karonda not to come into the room but Karonda came in anyway. Mary and defendant were fighting each other when Karonda entered the room. Mary testified defendant kicked Karonda, causing her to fall into the wall, and then he kicked her again after she had fallen to the floor. Mary then noticed a knife on the floor but denied ever seeing defendant with it. Mary did hear defendant threaten to cut Karonda's throat. Mary testified she saw Karonda pick the steak knife up from the floor and stab defendant. After Karonda stabbed defendant, he stopped kicking her. Mary testified the knife Karonda used to stab defendant was one of her steak knives that had been left in her bedroom from her dinner the night before. Mary testified she had taken all of the items, including the knife and a dinner plate, off of the dresser in order to clean the dresser top. Mary testified she placed everything back on the dresser except the plate because she planned to take it into the kitchen.

Mary testified defendant left the house and she attempted to keep him from reentering the house by standing in the doorway. Defendant then went to the side door and entered the house swinging a bumper jack. When the police arrived at the house, defendant went outside. Mary went searching for Karonda and found her lying on the steps by the front door. Mary testified Karonda was unconscious at first but then came to complaining of stomach pains.

Mary testified that on August 17, 1989, she saw defendant in the neighbor's yard yelling that he wanted all of the people in his house to leave. She did not personally witness a fight between defendant and Karonda on that date. Finally, Mary testified she felt Karonda's baby move between August 17 and September 17, 1989.

Gwendalyn Fabre Jenkins, Karonda's older sister, testified that on August 17, 1989, Karonda and defendant had a fight over the presence of Fuller in defendant's house. Gwendalyn testified defendant called Karonda's child a bastard and also made physical threats to Karonda. Gwendalyn testified defendant went outside and Karonda followed him. She did not recall whether Karonda had a knife in her hand. Gwendalyn saw defendant pick Karonda up and "body slam" her to the ground twice. Gwendalyn then interceded and hit defendant three times to get him off of Karonda. Gwendalyn testified Karonda had no problems with her pregnancy after this incident and Gwendalyn believed everything was normal with Karonda's pregnancy.

On September 17, 1989, Gwendalyn heard loud talking coming from Mary's bedroom, and when she entered the bedroom she saw Karonda and defendant fighting. She tried to get Karonda out of the bedroom but Karonda asked Gwendalyn to stay out of it. The next thing Gwendalyn remembered was defendant kicking Karonda and yelling that he was going to kick the baby out of her. Defendant kicked Karonda with such force she flew into the wall and then fell to the floor. Gwendalyn testified she saw defendant stomp on Karonda's abdomen with his combat boots. Gwendalyn saw a knife on the floor but did not know how it got into the room. She saw Karonda throw her arms in the air and saw defendant move the knife in a cutting motion towards Karonda. Gwendalyn then ran to the neighbor's house and telephoned the police. When she came back to the house, defendant was locked out of the house. Gwendalyn took Karonda outside and helped her lie down on the ground. Karonda told Gwendalyn she was having abdominal pains. Gwendalyn testified Karonda had a cut on the outside of her left wrist.

Lynn Simpson testified that on September 17, 1989, he, defendant, and Mary got into an argument regarding the history of defendant's house. Karonda joined in the argument and defendant told her to be quiet. Defendant then left the room to change clothes. Simpson testified that Karonda reached under the couch, pulled out a knife and showed it to him. She allegedly told him she was going to get defendant with the knife. Simpson testified the knife looked like a steak knife and that he told defendant what Karonda had said. Finally, Simpson testified that, on other occasions, Karonda had attacked defendant with sharp objects. Simpson testified he had never seen defendant start a fight with anyone.

Robert Steven Mason testified that on September 17, 1989, he was in Mary Marion's bedroom with Monica Bradley, Mary, and some others when defendant entered the room. A fight broke out between defendant and Mary, with defendant knocking things off Mary's dresser. Mason testified that Karonda then entered the room with a knife in her hand. Mason testified Karonda told defendant she was tired of the way he treated her mother and then took a swipe at him with the knife. Mason stated that on her follow-through with the knife, she almost stabbed him instead. Mason testified defendant had not kicked Karonda before she attempted to stab him with the knife. Finally, Mason testified he never saw defendant kick Karonda, nor did he see her fall to the floor.

On cross-examination, Mason admitted defendant burned Mary with a cigarette but did not recall whether she cried out. He also ad-

mitted that on September 17, 1989, he was taking several medications that had side effects which caused him to have trouble remembering and concentrating on things.

Monica Bradley testified that on August 17, 1989, after defendant ran outside, Karonda followed him with a knife. Bradley stated defendant did not invite Karonda to come outside. While they were outside, Bradley saw defendant throw Karonda to the ground and then get on top of her to attempt to get the knife away from her. Defendant got the knife away from her and threw it away. Karonda then went inside, changed clothes and came back out with another knife. Again, defendant threw Karonda to the ground and managed to take the knife from her.

Bradley described the events of September 17 as did the other witnesses, except she stated Karonda was not carrying anything when she first entered the master bedroom. Bradley did not see a knife on or near the dresser. She testified that as she was attempting to break up the fight between defendant and Karonda, defendant fell back onto the bed. Karonda managed to break free from whoever was holding her and stab defendant. Bradley did not know where the knife came from. She testified defendant began kicking and swinging after Karonda stabbed him as he was trying to get out of the room. She never specifically saw defendant kick Karonda but testified there was a lot of commotion in the bedroom.

Defendant admitted he was intoxicated on the afternoon of September 17, 1989. He testified that when Simpson dropped him off that evening, he was not in a good mood because he wanted to go to sleep. Defendant testified he began arguing with Mary and pushing stuff from her dresser onto the floor. Defendant was smoking a cigarette and testified he "must have burned her by accident." Defendant believed Karonda had a knife in her hand when she entered the bedroom. Defendant and Karonda began to argue, either Monica Bradley or Mary pushed defendant onto the bed and then Karonda stabbed him. Defendant denied making any physical contact with Karonda prior to her stabbing him. Defendant testified he threw up his hands and kicked out as he tried to get off the bed and that if he kicked Karonda, it was only because she was going to stab him again.

## II. MEDICAL EXPERTS

### A. *The State's Experts*

Dr. Enid Gilbert, a professor of pediatrics and pathology at the University of Wisconsin, was the first medical expert to testify for

the State. Based on an examination of the case file, Dr. Gilbert gave an opinion that the cause of death of the fetus was:

"due to the impact to the abdomen an abruption of the placenta occurred causing massive hemorrhage both behind the placenta, separating the uterus or womb from the placenta, and hemorrhage actually into the placenta. This was a massive hemorrhage which would have precluded normal blood flow to the fetus and would result in the death of the baby."

Dr. Gilbert testified that People's exhibit No. 12, a color photograph, depicted the maternal surface of the placenta which is normally attached to the womb or uterus and evidenced a massive hemorrhage to the placenta. Dr. Gilbert testified the blood clot on the placenta was formed within 48 hours of the delivery of the placenta. People's exhibit No. 13, another color photograph, depicted the fetal skull after the scalp was removed. Dr. Gilbert testified that after fetal death, the brain liquifies, causing the skull bones to overlap. However, she testified that in this case, the skull overlap was minimal and thus death was not present for more than 48 hours. People's exhibit Nos. 14 and 15, which depicted the fetus' full body, evidenced skin slippage, a condition that causes the skin to peel within 24 hours of death. She testified the discoloration in the trunk of the fetus could have resulted from the impact of the blow to Karonda's abdomen. Dr. Gilbert did not place any special significance on the fact that there was no fetal blood found in the mother's circulation. There was a maternal hemorrhage, which caused the circulation of blood to the fetus to be blocked, which in turn could have resulted in the fetus' anemic appearance.

On cross-examination, Dr. Gilbert admitted that in her original letter to the investigator on the case, she placed the fetal death 72 hours before delivery. However, she explained that, after reviewing all of the records again, she amended that conclusion to place the time of death of the fetus at 48 hours before delivery. She testified she was aware that the autopsy report showed no evidence of bleeding of the fetus and placenta. In her opinion, the pathologist who performed the autopsy made a mistake and overlooked the hemorrhage to the placenta. She acknowledged the fact that the ultrasound done in the emergency room did not reveal an abruption of the placenta, but explained that since it was done within one hour of the incident, evidence of the abruption might not have been present yet. Dr. Gilbert testified she was aware the autopsy found the cause of death undetermined but she would have reached a different conclusion. Finally, Dr. Gilbert testified that the fact the pathologist who performed the au-

topsy was able to recognize various tissues and organs (*i.e.*, heart, lungs, kidneys, spleen, and scalp tissues) was "incontrovertible evidence" of death within 48 hours of delivery since, had death occurred at any earlier time, these tissues and organs would have been more decayed and disintegrated.

Dr. Barrett W. Dick testified that on September 20, 1989, he performed an autopsy on the fetus and placenta delivered by Karonda Marion. Dr. Dick testified the findings from the autopsy were that the fetus was decomposed or macerated, pale, and that there were no anatomic lesions of the fetus, fetal surface, or blood vessels of the placenta. Dr. Dick identified People's exhibit Nos. 14 and 15 as depicting skin slippage around the head of the fetus. He testified that because of the anemic appearance of the fetus, he suspected the fetus had lost its blood. He therefore searched for sources for the blood loss, *i.e.*, from the blood vessels of the umbilical cord or bleeding into the maternal circulation. He concluded "no source of bleeding was noted on examination of the fetus and the placenta and no evidence of fetal maternal hemorrhage." Dr. Dick testified that this conclusion as to "no source of bleeding on the placenta" was not in reference to the photograph of the placenta.

On cross-examination, Dr. Dick testified he could not be sure whether the placenta showed evidence of an abruption or just maternal bleeding as that conclusion was out of his area of expertise. He stood by his conclusion that the cause of death of the fetus was undetermined with the suggested cause of death as blood loss to the fetus due to the marked paleness of the tissues.

Dr. Dolores Fernandez, a diagnostic radiologist, testified she went to Mercy Hospital on September 17, 1989, at approximately 7:50 to 8 p.m. at the request of the emergency room nurse to determine whether there had been any damage to the placenta of Karonda. The emergency room nurse told Dr. Fernandez the baby was fine since she had heard its heartbeat. Dr. Fernandez and her assistant performed an ultrasound on Karonda for approximately 15 minutes. They concluded there was no fetal heartbeat. She could not, within a reasonable degree of medical certainty, determine the time of death of the fetus due to conflicting findings from the ultrasound. For example, the skull overlapping and evidence of an abnormal amount of fluid in the fetus' tissue indicated the fetus had been dead for at least 48 hours. On the other hand, there was a normal amount of amniotic fluid within the uterus, fluid in the fetal bladder and fluid in Karonda's stomach which would not have been present if the fetus had been

dead for a long time. The closest approximation Dr. Fernandez could make was that the fetus had not been dead for more than 48 hours.

On cross-examination, Dr. Fernandez admitted the sonogram did not reveal an abruption in the placenta. She qualified that admission by stating that a small tear in the placenta could have been missed and that if there was a suspicion that a tear existed, the normal procedure would be to do another ultrasound hours or even a day later. This would enable the doctor to determine whether in fact a tear existed because the continual bleeding would result in the collection of blood adjacent to the placenta which would be readily apparent on the sonogram. Dr. Fernandez testified she could have missed a small tear that could have later produced a large hemorrhage, but could not have missed a large hemorrhage. Finally, she testified there was no definitive evidence of an abruption of the placenta.

Susan Fifield and Jodi Smalley both testified they were registered nurses employed by Mercy Hospital on September 17, 1989. They each described the procedure performed on Karonda in the emergency room that day wherein, through the use of a Doppler device (a device similar to a transistor radio used to listen to a fetal heartbeat), they heard the heartbeat of Karonda's fetus. Each had no doubt in her mind that there was a fetal heartbeat between 7 and 7:30 p.m. on September 17, 1989. Irene Ayre testified she was a registered nurse for Mercy Hospital. She delivered Karonda's fetus on September 19, 1989, at approximately 5:31 p.m. On her chart, she noted the condition of the fetus as macerated with skin peeling.

### B. Defendant's Experts

Dr. Anton J. Dubrick testified that on September 17, 1989, he was employed as an emergency room physician by Mercy Hospital. Dr. Dubrick testified when Karonda arrived at Mercy she had no signs of trauma and was experiencing very minimal pain. She was neither nauseous nor vomiting and had no vaginal bleeding. He did a brief screening exam of Karonda, went to see other patients and then came back to Karonda and did a more thorough exam. Dr. Dubrick had been told by Nurse Smalley that fetal heart tones were present. Dr. Dubrick stated it was not uncommon for the nurse to take a fetal heartbeat, and for the physician not to listen unless there was a situation of doubt. But, it is common for the nurse to ask the physician to confirm the presence or lack thereof of the fetal heartbeat, and he was surprised to learn Nurse Smalley had another nurse confirm the heartbeat rather than himself.

Dr. Dubrick palpated Karonda's abdomen and found it to be normal and soft. He found Karonda to be emotionally upset but not in pain. He contacted the gynecologist on call, reported that Karonda seemed all right and recommended admitting her overnight for observation. The gynecologist, Dr. Trupin, disagreed with this recommendation and ordered a sonogram. Dr. Dubrick ordered the sonogram and was subsequently told there was no fetal heartbeat. He was very much surprised to hear the fetus was dead because he had been told a fetal heartbeat had been heard earlier and Karonda seemed to be okay. Dr. Dubrick looked at the screen which projected the images of the sonogram but admitted he could not determine anything from the screen because it was out of his field of expertise. Dr. Dubrick testified it is possible to make mistakes when attempting to verify or deny the presence of a fetal heartbeat. Dr. Dubrick believed it was possible that a mistake was made in this case in obtaining a fetal heart tone. This was based on his belief the sonogram showed classic signs of the fetus being dead for some time (*i.e.*, skull overlapping and an edema of the abdominal wall and torso) and the fact that two days later Karonda delivered a macerated, degenerated infant.

On cross-examination, Dr. Dubrick admitted he did not have the ability to determine the significance of several factors present in the fetus, namely the time skin slippage first appears on a dead fetus, the significance of a normal amount of amniotic fluid in the womb, and the significance of a full bladder in the fetus and fluid in the fetus' stomach.

Dr. Camilla Parham testified she had been a licensed medical doctor for four years and was employed as a family practice physician at the Francis Nelson Community Health Center. Dr. Parham testified Karonda was a prenatal patient of hers and she saw Karonda on two occasions, August 4, 1989, and August 11, 1989. On August 11, 1989, Dr. Parham measured Karonda's umbilicus which determined the fetus to be 20 weeks old. Dr. Parham testified she prescribed prenatal vitamins for Karonda. Finally, Dr. Parham testified Karonda's initial blood count showed her to be anemic, which is often found in adolescent prenatal patients.

The final doctor to testify in this matter was Dr. William Matviuw, a physician engaged in private practice in the field of obstetrics and gynecology. Dr. Matviuw had an opportunity to review the complete medical record in this case. Based on this review, he concluded there was no evidence of a crushing injury to Karonda's uterus. Dr. Matviuw further concluded five things from the sonogram performed by Dr. Fernandez on Karonda in the emergency room on September

17. First, he found the sonogram indicated the fetus was dead. Second, he noted the collapse of the skull, which never occurs less than two weeks after death. Third, he concluded there was swelling on the head and abdominal skin which was caused by fluid coming through the skin after death. This usually occurs no less than one or two weeks after death. Dr. Matviuw estimated the fetus was approximately 20.3 weeks old. Last, Dr. Matviuw found no evidence of an abruption of the placenta. If there was a sudden abruption, Dr. Matviuw testified the ultrasound would "clearly show" the separation and the forming of a blood clot. Dr. Matviuw placed no significance on the fact that there was fluid in the fetus' bladder. He testified he researched that fact himself and spoke to three ultrasonographers who believed there was no significance to that fact. Dr. Matviuw testified the brownish liquid expelled prior to delivery indicated the fetus had been decomposing in its own fluid for two to three weeks. Dr. Matviuw testified if there was an abruption of the placenta, huge amounts of blood clots would be expelled with the delivery of the placenta, evidencing maternal hemorrhaging. He noted the lack of such hemorrhaging when Karonda delivered the fetus and placenta.

Dr. Matviuw examined the placenta photograph and testified he was absolutely sure there was no abruption on the placenta. Rather, he attributed the dark color of the blood as evidencing a placenta that had been dead or dying for a while. He testified it was impossible to make any conclusions about the overlap of the skull depicted in People's exhibit No. 13 because of the way the skull was being held.

Dr. Matviuw testified if a woman who was five months pregnant sustained a blow to her abdomen which caused an abruption of the placenta, the woman would feel pain in her uterus and there would be blood clots at the time of delivery. He testified there can be mistakes made in the use of a Doppler device when determining whether a fetal heart tone exists. Last, Dr. Matviuw stated he was absolutely sure the fetus had died several weeks before Karonda was admitted to the hospital. He was equally sure that the trauma which occurred to Karonda on September 17, 1989, could be excluded as a cause of death of the fetus.

On cross-examination, Dr. Matviuw testified that during his residency in 1967 or 1968, he had six months of training in pathology. He admitted it had been a few years since the last time he determined the time of death of a fetus. Dr. Matviuw had only conducted a few autopsies, approximately 20 or 25 years ago. Only once or twice a year does he have occasion to review any pathology reports on dead fetuses.

Defendant was found guilty of causing the death of the unborn child of Karonda Marion and was subsequently sentenced to a term of 20 years' imprisonment. Defendant now brings this appeal raising both constitutional and evidentiary issues.

### III. ANALYSIS

In *People v. Greer* (1980), 79 Ill. 2d 103, 402 N.E.2d 203, defendant was convicted of the murder of an unborn fetus. Defendant beat his girlfriend with a broomstick, thereby causing her death and the death of her 8½-month-old fetus. There was no separate feticide statute and defendant was convicted of the murder of the fetus under the murder statute. (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(a).) The supreme court reversed as to the murder of the fetus. (*Greer*, 79 Ill. 2d at 124, 402 N.E.2d at 213.) The court looked to the common law since the legislative comments indicated the murder statute codified the common law. Under the common law, the killing of a fetus was not murder unless the fetus was born alive and subsequently died as a result of the injuries previously sustained. (*Greer*, 79 Ill. 2d at 111, 402 N.E.2d at 207.) The court noted several jurisdictions which still subscribed to this "born alive" rule. Still other jurisdictions had enacted specific feticide statutes. However, the court noted no jurisdiction, in the absence of such a feticide statute, had held that the killing of a fetus is murder unless the fetus is born alive and then dies. (*Greer*, 79 Ill. 2d at 111, 402 N.E.2d at 207.) Therefore, the court concluded, since the legislature had not acted to specifically include the unborn within the potential victims of homicide nor acted to create a separate feticide statute, it could not create such an offense. The court held the taking of the life of a fetus was not murder unless the fetus was born alive and subsequently expired from the injuries inflicted. *Greer*, 79 Ill. 2d at 116, 402 N.E.2d at 209.

In response to the *Greer* decision, the legislature enacted a feticide statute in 1981, Public Act 82—303, effective August 21, 1981 (1981 Ill. Laws 1676). (Ill. Rev. Stat. 1981, ch. 38, par. 9—1.1.) First, the statute required that the actor knew or should have reasonably known that the mother was pregnant. Second, the statute required that the actor either attempted or committed the felony against the *mother* or acted in a way which evidenced an intent to cause death or great bodily harm to the mother. Thus, the rationale behind the statute was to "offer some assurances to pregnant mothers, that they can expect to carry that child full term without fear of aggravated assault *** resulting in the loss of that child." (82d Ill. Gen. Assem., Senate Proceedings, May 19, 1981, at 198 (statements of Senator Thomas)

(debates on Senate Bill 192).) Most importantly, the statute required that the fetus "to have been capable, at the time of its death, of sustained life outside of the mother's womb with or without life support equipment" and such capacity had to be proved beyond a reasonable doubt. (Ill. Rev. Stat. 1981, ch. 38, par. 9—1.1(b).) The statute did not criminalize such acts unless the actor knew, or reasonably should have known under all of the circumstances, that the mother was pregnant; nor those intended to hurt the fetus as opposed to the mother. Moreover, the statute had a viability requirement and did not criminalize acts against nonviable fetuses.

Thereafter, in 1986, the legislature repealed the 1981 feticide statute (Pub. Act 84—1414, §2, eff. Sept. 19, 1986 (1986 Ill. Laws 3511, 3514)) and enacted various other provisions criminalizing acts against unborn children. (Pub. Act 84—1414, §1, eff. Sept. 19, 1986 (1986 Ill. Laws 3511, 3514).) Five separate offenses were created, including (1) intentional homicide of an unborn child (Ill. Rev. Stat. 1987, ch. 38, par. 9—1.2); (2) voluntary manslaughter of an unborn child (Ill. Rev. Stat. 1987, ch. 38, par. 9—2.1); (3) involuntary manslaughter and reckless homicide of an unborn child (Ill. Rev. Stat. 1987, ch. 38, par. 9—3.2); (4) battery of an unborn child (Ill. Rev. Stat. 1987, ch. 38, par. 12—3.1); and (5) aggravated battery of an unborn child (Ill. Rev. Stat. 1987, ch. 38, par. 12—4.4). Sections 9—1.2(a)(2) and (a)(3) of the fetal homicide statute, of which defendant was convicted, provide:

"A person commits the offense of intentional homicide of an unborn child if, in performing acts which cause the death of an unborn child, he without lawful justification:

(1) ***; or

(2) he knew that his acts created a strong probability of death or great bodily harm to the pregnant woman or her unborn child; and

(3) he knew that the woman was pregnant." (Ill. Rev. Stat. 1987, ch. 38, pars. 9—1.2(a)(2), (a)(3).)

Section 9—1.2(b)(1) of this statute defines an "unborn child" as "any individual of the human species from fertilization until birth." (Ill. Rev. Stat. 1987, ch. 38, par. 9—1.2(b)(1).) Thus, the legislature has eliminated any viability requirement as well as the "born alive" rule. The statute also crimnializes acts directed against the unborn child.

Defendant first contends the fetal homicide statute violates the equal protection clause of the United States Constitution because it fails to distinguish between viable and nonviable fetuses.

Defendant argues that under *Roe v. Wade* (1973), 410 U.S. 113, 35 L. Ed. 2d 147, 93 S. Ct. 705, a woman can destroy her nonviable fe-

tus without incurring criminal penalties and has an absolute right to an abortion within the first trimester. Defendant argues by contrast that, if he destroys a nonviable fetus, he faces severe criminal penalties. Thus, he appears to claim he and a pregnant woman are similarly situated persons being treated dissimilarly, thus amounting to a violation of the equal protection clause of the United States Constitution.

An identical argument was made by the defendant in *State v. Merrill* (Minn. 1990), 450 N.W.2d 318. There, defendant shot and killed a woman and her 27- or 28-day-old embryo. The statute in question followed the Minnesota State murder statute except that the words "unborn child" were substituted for the terms "human being" and "person." "Unborn child" was defined as "the unborn offspring of a human being conceived, but not yet born." (*Merrill*, 450 N.W.2d at 320-21.) Defendant was convicted of murder of the embryo and subsequently appealed, contending the statute violated the equal protection clause because it failed to distinguish between viable and nonviable fetuses. In rejecting this argument, the Minnesota Supreme Court noted that a pregnant woman who chooses to have an abortion and the defendant who assaults a pregnant woman causing the death of her fetus are not similarly situated. A woman's choice to terminate her pregnancy is based on her constitutionally protected right to privacy, which encompasses her decision whether to continue or terminate her pregnancy. The court stated, "*Roe v. Wade* protects the woman's right of choice; it does not protect, much less confer on an assailant, a third-party unilateral right to destroy the fetus." (*Merrill*, 450 N.W.2d at 322.) The court went on to note that the court in *Roe* had found the State " 'has still *another* important and legitimate interest in protecting the potentiality of human life.' " (Emphasis in original.) (*Merrill*, 450 N.W.2d at 322, quoting *Roe*, 410 U.S. at 162, 35 L. Ed. 2d at 182, 93 S. Ct. at 731.) The court found the fetal homicide statute sought to protect the potentiality of human life but did so without impinging on the woman's constitutional right to privacy. The court, therefore, concluded:

> "The state's interest in protecting the 'potentiality of human life' includes protection of the unborn child, whether an embryo or a nonviable or viable fetus, and it protects, too, the woman's interest in her unborn child and her right to decide whether it shall be carried *in utero*. The interest of a criminal assailant in terminating a woman's pregnancy does not outweigh the woman's right to continue the pregnancy. In this context, the viabil-

ity of the fetus is 'simply immaterial' to an equal protection challenge to the feticide statute." *Merrill,* 450 N.W.2d at 322.

■ Clearly, a pregnant woman who chooses to terminate her pregnancy and the defendant who assaults a pregnant woman, causing the death of her fetus, are not similarly situated. A woman consents to the abortion and has the absolute right, at least during the first trimester of the pregnancy, to choose to terminate the pregnancy. A woman has a privacy interest in terminating her pregnancy; however, defendant has no such interest. The statute simply protects the mother and the unborn child from the intentional wrongdoing of a third party. The legislature has chosen to punish this third-party conduct by imposing criminal liability.

A two-step analysis is utilized to determine whether a legislative classification deprives individuals of equal protection. The court must first determine the proper level of scrutiny to be applied to the challenged classification. When the statute under consideration affects a fundamental right, or discriminates against a suspect class, courts will apply a strict scrutiny test and only uphold it if it serves a compelling State interest. If neither a fundamental right nor a suspect class is affected by this statute, a rational basis test is used. Under this analysis, a statutory classification must bear a rational relationship to a valid legislative purpose. The classification created by the statute will only be declared violative of the equal protection clause if based on reasons totally unrelated to the pursuit of a legitimate State goal. (*People v. Esposito* (1988), 121 Ill. 2d 491, 499-500, 521 N.E.2d 873, 876-77.) The equal protection clauses of the United States and Illinois Constitutions do not prohibit the General Assembly from enacting legislation which affects different classes of persons differently. *Esposito,* 121 Ill. 2d at 500-01, 521 N.E.2d at 877.

Under an equal protection analysis, the fetal homicide statute neither affects a fundamental right nor does it discriminate against a suspect class. Therefore, since no protectable interest of defendant is affected by the statute, there need only be a rational basis for the statute to be constitutional. The statute must bear a rational relation to a valid legislative purpose to be constitutional. The United States Supreme Court has stated a State does have an "important and legitimate interest in protecting the potentiality of human life." (*Roe,* 410 U.S. at 162, 35 L. Ed. 2d at 182, 93 S. Ct. at 731.) Thus, there is a valid legislative purpose in protecting the potentiality of human life. The classifications created by the statute (*i.e.,* acts of pregnant women or in certain medical practices, as distinct from acts of third parties which fall within the statutory proscriptions) must, and do,

bear a rational relationship to this valid legislative purpose. The imposition of criminal penalties on those who commit acts against unborn children protects the potentiality of life. By imposing severe penalties for this crime, others will be deterred from committing similar crimes, which in turn protects potential human life. The legislature could have rationally concluded that by imposing criminal penalties on defendants for this type of conduct, the valid State interest in protecting the potentiality of human life would be furthered by the statute. Therefore, the fetal homicide statute does not violate the equal protection clause of the United States Constitution.

Defendant next argues the fetal homicide statute is unconstitutionally vague because the phrase "caused the death" is "fraught with uncertainty and ambiguity and in many instances would be incapable of objective measurement in dealing with nonviable embryos at an early stage." Defendant contends that the absence of statutory definitions of when "life" begins and "death" occurs will result in the trier of fact applying its subjective religious, philosophical, and political views to define those terms, thereby leading to arbitrary and discriminatory enforcement of the statute.

■ The State asserts that this court need not address the question of whether the statute is unconstitutionally vague for failing to define life and death because defendant lacks standing to raise that issue. The State maintains defendant lacks standing because the medical evidence established the fetus was anywhere from 20.3 to 24 weeks gestational age and had been alive in Karonda's uterus. Thus, this case clearly involved a live fetus that subsequently expired. The State further contends that if this court chooses to proceed to the merits of defendant's claim, the statute is not unconstitutionally vague because it can be applied in a valid manner.

A party who would attack a statute as unconstitutional must bring himself within the class as to whom the law is unconstitutional. (*People v. Shum* (1987), 117 Ill. 2d 317, 512 N.E.2d 1183.) There, defendant challenged the feticide statute of 1981 as unconstitutionally vague because it failed to adequately define at what stage culpability was triggered. Because that statute required the fetus be capable of sustaining life outside the womb before a defendant could be convicted of murder, the defendant argued the shifting medical opinion as to that point would deny a person of ordinary intelligence fair notice that the conduct was forbidden. The supreme court held the defendant lacked standing because the medical evidence established the pregnant woman was four days past her due date and in the early stages of labor. Because the fetus was obviously capable of sustaining

life outside of the womb, defendant was not in a class of offenders who could challenge the lack of statutory definitions. *Shum,* 117 Ill. 2d at 358, 512 N.E.2d at 1199.

Similarly, here, although there was conflicting evidence as to the time and cause of death of the fetus, the trial court found the fetus was alive in the uterus at one point prior to defendant's attack. Two nurses testified they heard fetal heart tones in the emergency room. Karonda testified she felt the baby kick in the emergency room prior to the sonogram. She also testified, as did her mother and her sister, that the fetus moved between August 17 and September 17, 1989. Since there was evidence that the fetus was alive and then expired after defendant's attack, defendant has no standing to challenge the definitions of life and death in the statute.

Where a due process vagueness challenge is raised and the first amendment is not involved, two requirements must be fulfilled. First, the statute must give a person of ordinary intelligence a reasonable opportunity to know what conduct is lawful or unlawful. Second, the statute must provide standards, so as to avoid arbitrary and discriminatory enforcement in application by police officers, judges and juries. (*People v. O'Donnell* (1987), 116 Ill. 2d 517, 508 N.E.2d 1066.) Criminal statutes are inherently limited to words as their medium. For this reason, the impossible burden of mathematical certainty is neither expected nor imposed by either the Federal or State Constitution. When deciding a vagueness question, a court will assign the words of the statute their ordinary and popularly understood meaning unless there exists a legislative intent to the contrary. *People v. Lowe* (1990), 202 Ill. App. 3d 648, 560 N.E.2d 438.

In *Merrill,* the defendant argued that since the statute required the death of the embryo, a determination must have been made that the embryo was alive previously. This in turn raised the question of when "life" begins as well as when "death" occurs. The Minnesota Supreme Court found the statute did not raise the issue of when life as a *human person* begins. The statute only required the State to prove that the embryo or fetus was once living and then no longer had life. It was not necessary to prove that the living organism in the mother's womb, whether an embryo or a fetus, was a person or human being. The court noted that people have vastly different views on whether an embryo or a fetus is a human being or a person and at what stage the embryo or fetus attains "personhood." The court further noted that these questions were entirely irrelevant to the criminal liability under the statute. The statute only required proof that the genetically human embryo be a living organism and that it was

growing into a human being. Death then occurs when the embryo no longer has the properties of life. *Merrill*, 450 N.W.2d at 324.

The same rationale leads us to conclude the fetal homicide statute here is constitutional. Our statute defines "unborn child" as "any individual of the human species from fertilization until birth." (Ill. Rev. Stat. 1987, ch. 38, par. 9—1.2(b)(1).) It is unnecessary to prove the unborn child is a person or human being. The statute only requires proof that, whatever the entity within the mother's womb is called, it had life and, because of the acts of the defendant, it no longer does. The name given to that entity is irrelevant to the liability under the statute. The trier of fact will only be asked to determine whether the particular entity, whether an embryo, fetus, person, or human being, once had life and, because of the acts of the defendant, no longer does.

The challenger of a statute must demonstrate that the law is impermissibly vague in all its applications (*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.* (1982), 455 U.S. 489, 497, 71 L. Ed. 2d 362, 371, 102 S. Ct. 1186, 1193) and that the statute could never be applied in a valid manner (*United States v. Salerno* (1987), 481 U.S. 739, 745, 95 L. Ed. 2d 697, 707, 107 S. Ct. 2095, 2100). If a law is susceptible of a reasonable interpretation which supports the constitutionality, the court must accord the law that meaning. (*United States v. National Dairy Products Corp.* (1963), 372 U.S. 29, 32, 9 L. Ed. 2d 561, 565, 83 S. Ct. 594, 598.) The trier of fact need not decide whether the entity within the mother's womb is a person or human being, but only that it once had life which was snuffed out by the acts of the defendant. This is a reasonable interpretation of the law. Thus, the statute will not be applied in an arbitrary or discriminatory manner and therefore does not violate the due process clause of the United States Constitution.

Defendant's final argument is that he was not proved guilty beyond a reasonable doubt of intentional homicide of an unborn child because there was insufficient proof that (1) he had the criminal intent to cause the death of the fetus, and (2) the fetus was alive on September 17, 1989.

■■ The proper standard when reviewing a sufficiency of the evidence question is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277, citing *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789.) The evidence in this case was suffi-

cient to prove beyond a reasonable doubt that defendant knew Karonda was pregnant, had the requisite criminal intent to cause the death of her unborn child, and that the fetus was alive prior to his actions on September 17 and thereafter expired.

For the foregoing reasons, we affirm defendant's conviction and sentence.

Affirmed.

GREEN and KNECHT, JJ., concur.