**UNITED STATES ex rel., Robert FORD, Petitioner,**

v.

**Rodney J. AHITOW, et al., Respondents.**

No. 94–2126.

United States District Court,
C.D. Illinois,
Danville/Urbana Division.

June 2, 1995.

---

🔢
**910**

Robert Ford, Jr., Illinois River Correctional Center, Canton, IL, pro se.

Karen Alice Kloppe, Atty. Gen., Springfield, IL, for respondents.

## ORDER

BAKER, Senior District Judge.

### I.

Robert Ford, the petitioner, is a prisoner in the Illinois Department of Corrections and has filed a *pro se* petition for a writ of habeas corpus under 28 U.S.C. § 2254. At this time, the court grants the petition and orders the writ. This court finds that Ford is in "custody in violation of the Constitution ... of the United States." 28 U.S.C. § 2254(a). Specifically, the state failed to prove the petition-

er guilty beyond a reasonable doubt, and therefore the petitioner's incarceration violates due process.

The Supreme Court has very recently restated that "issuance of the writ will, at least often, avoid a grievous wrong—holding a person in custody in violation of the Constitution of the United States." *O'Neal v. McAninch*, —— U.S. ——, ——, 115 S.Ct. 992, 993, 130 L.Ed.2d 947 (1995). The federal courts' habeas power "protects individuals from unconstitutional convictions and helps to guarantee the integrity of the criminal process by assuring that trials are fundamentally fair." *Id.*

In July, 1990, Ford was convicted of intentional homicide of an unborn child[1] in the Circuit Court of Champaign County, Illinois, Sixth Judicial Circuit. He was sentenced to twenty years in prison. Ford was convicted after a bench trial. The bench trial included both occurrence and medical testimony.

Ford appealed his conviction. Ford's appeal was two pronged—he claimed that the Illinois feticide statute violated the equal protection and due process provisions of the United States Constitution, and he claimed his conviction under that statute violated due process. The Illinois Appellate Court, Fourth District, affirmed his conviction. *People v. Ford*, 221 Ill.App.3d 354, 163 Ill. Dec. 766, 581 N.E.2d 1189 (1991).

The appellate court held that the Illinois feticide statute does not violate equal protection even though it fails to distinguish between a viable and nonviable fetus. *People v. Ford*, 163 Ill.Dec. at 776–777, 581 N.E.2d at 1199–1200. The appellate court also held that Ford lacked standing to challenge the statutory definition of "unborn child" as unconstitutionally vague.[2] 163 Ill.Dec. at 778,

---

1. Ford was convicted under Illinois' feticide statute which prohibits the intentional homicide of an unborn child:
(a) A person commits the offense of intentional homicide of an unborn child if, in performing acts which cause the death of an unborn child, he without lawful justification:
(1) either intended to cause the death of or do great bodily harm to the pregnant woman or her unborn child or knew that such acts would cause death or great bodily harm to the pregnant woman or her unborn child; or

(2) he knew that his acts created a strong probability of death or great bodily harm to the pregnant woman or her unborn child; and
(3) he knew that the woman was pregnant.
720 ILCS 5/9–1.2(a).

2. (b) For purposes of this Section,

(1) "unborn child" shall mean any individual of the human species from fertilization until birth,
720 ILCS 5/9–1.2(b)(1).

581 N.E.2d at 1201. The appellate court also held that the evidence was sufficient to support a finding of guilt beyond a reasonable doubt, and therefore the conviction did not violate due process. *Id.*

Ford renewed each of his constitutional claims in his petition for leave to appeal before the Illinois Supreme Court. Leave to appeal was denied. *People v. Ford,* 221 Ill. App.3d 354, 163 Ill.Dec. 766, 581 N.E.2d 1189 (1992).

Next, Ford filed a petition for a writ of habeas corpus in this court on May 18, 1994. Under 28 U.S.C. 2254, before a federal court can consider a petition for habeas corpus, it must determine that the petitioner is in custody pursuant to the judgment of a state court, and that the petitioner has exhausted all available state remedies. On May 26, 1994 this court recognized that the petitioner, Ford, was in custody pursuant to a state court judgment, and that he had raised constitutional claims. Under Habeas Rule 5, this court ordered the respondents to answer the petition, specifying that the respondents were to address whether the petitioner had exhausted state remedies, and additionally to address the substance of the petitioner's constitutional claims. The respondents filed an answer stating that the petitioner had exhausted all state remedies, and arguing against all of the petitioner's constitutional claims.

The court now addresses the petitioner's substantive claim that his constitutional rights have been violated by his state court conviction and subsequent incarceration.

## II.

During the relevant time period, Ford lived with his wife Mary Marion and her two daughters, Gwendalyn and Karonda. Karonda was confirmed pregnant in August, 1989. During a prenatal visit to the Francis Nelson Community Health Center on August 11, 1989, Dr. Camilla Parham determined that Karonda's fetus was approximately 20 weeks old. Dr. Parham found Karonda to be moderately anemic, typical in teen pregnancies,

but otherwise the pregnancy was normal. Dr. Parham put Karonda on prenatal vitamins and an iron supplement. Karonda stopped taking the vitamins because she thought they made her sick.

The Robert Ford/Mary Marion household was often troubled by drunkenness and violence. The animosity between Ford and Karonda Marion seems to have been particularly acute. Two incidents stand out: August 17, 1989 and September 17, 1989.[3]

August 17, 1989 was Karonda's seventeenth birthday. Karonda's uncle, Arthur Lyn Fuller, was visiting. Ford had been drinking. He came into the house, saw Fuller eating at the kitchen table, and started yelling "get the fuck out of my house." Fuller and Ford were yelling back and forth. Karonda was defending Fuller and yelling at Ford. Ford left the room and returned holding a pool cue, he thumped the pool cue on the palm of his hand. Ford threatened Karonda and her fetus. (Ford yelled that he would knock the bastard out of her stomach.) Karonda got a knife out of the kitchen drawer. Ford left the house. Karonda followed him outside with a knife in her hand. Ford "body slammed" Karonda, or lifted her up in the air and threw her down onto the ground. He got the knife out of her hand and threw it. Ford was pulled off of Karonda by Fuller and/or Gwendalyn. Outsiders intervened and stopped the fight.

Karonda testified that she didn't suffer any abdominal pain or vaginal discharge or bleeding subsequent to the August 17 fight with Ford. She did not receive any prenatal medical care at that time or at any time following. Karonda testified that she felt the fetus kick between August 17 and September 17.

At approximately 6:00 p.m., on September 17, 1989, Karonda and Ford fought again. There were a number of friends and family members present at the time. Ford came into the house drunk and yelled at his wife Mary. He threw Mary's medication into the garbage, and Mary retrieved it. He burned

---

**3.** The testimony conflicts as to the precise details of these two events. However, a general account is possible. How to resolve conflicts between eyewitness accounts is a question of credibility, reserved for the finder of fact, not a federal court on habeas review.

Mary with a cigarette. Mary yelled "ouch." At this point, Karonda entered the room.

Karonda intervened between her mother and Ford. Both Karonda and Ford were yelling. Ford threatened to kick the bastard out of Karonda's stomach. Ford and Karonda fought. Accounts differ as to the precise chronology of the fight, but there is a consensus that Ford kicked Karonda hard in the stomach, a number of times, and Karonda stabbed Ford. Ford was wearing black combat boots when he kicked Karonda. Karonda used a steak knife to stab Ford.

Bleeding, Ford left the house, but he returned minutes later carrying a bumper jack. Mary Marion tried to keep Ford out of the house, but he entered through a side door. He hit the stove with the bumper jack. Karonda got a different knife, and said she intended to kill Ford. When the police arrived Karonda and Ford were outside in different places. The police ordered ambulances for both. Ford was bleeding from his stab wound. Karonda felt pain in her stomach.

The ambulance paramedics found a cut on Karonda's wrist and bandaged it. Inside the ambulance on the way to the hospital, a paramedic tried to find the fetal heartbeat with a stethoscope, but could not find it. The paramedic tried approximately five different stethoscope readings, but couldn't find the fetal heartbeat. He did locate Karonda's maternal heartbeat. During this time, Karonda felt some pain, but it was not severe. There were no bruises or contusions on Karonda's abdomen.

In the hospital emergency room, Karonda's abdominal pain was minimal. The emergency room physician, Dr. Dubrick, examined Karonda for signs of trauma, but found none. Karonda was not experiencing vaginal bleeding, nausea or vomiting. After this brief initial screening exam, Dr. Dubrick left to attend to other patients.

After Dr. Dubrick left, a nurse used a Doppler device and located a fetal heartbeat; a second nurse confirmed the Doppler reading. Dr. Dubrick returned and did a more thorough examination. During the trial Dr. Dubrick testified that it is unusual for a nurse to call a second nurse to confirm a Doppler reading. The more typical practice is for a nurse to call a doctor to confirm the reading. Dr. Dubrick also testified that Doppler readings can erroneously report a fetal heartbeat when there is actually no such heartbeat.

Dr. Dubrick thought Karonda and her fetus were probably fine. He conferred with the obstetrician on call, Dr. Trupin. Dr. Trupin recommended a sonogram, just to be absolutely sure that the fetus was okay. Dr. Fernandez, a diagnostic radiologist, performed an ultrasound/sonogram on Karonda at about 8:00 p.m. on September 17, 1989. The sonogram showed Karonda's fetus was dead. Two days later, on September 19, 1989, nurse Irene Ayre delivered the dead fetus and the placenta. The dead fetus was macerated with peeling skin.

When the sonogram showed the fetus to be dead, Dr. Dubrick was notified. He was surprised, and immediately went to view the sonogram himself. He looked at the ultrasound pictures as they were being taken. Dr. Dubrick testified that in his opinion, the Doppler finding of a fetal heartbeat was erroneous. Dr. Dubrick testified that the sonogram showed a fetus that had been dead for some time. Specifically the sonogram showed overlapping skull bones and edema of the abdominal wall and torso. Dr. Dubrick asserts that these things "could not have developed instantly." Additionally, a very broken down, macerated fetus was delivered two days later. Dr. Dubrick testified that these known facts led him to the conclusion that the Doppler reading was mistaken in finding a fetal heartbeat. According to Dr. Dubrick, it would be "impossible" for the dead fetus in the ultrasound pictures, and the macerated, degenerating fetus that was delivered to have been alive at the time of the Doppler reading.

Dr. Fernandez performed a fifteen to twenty minute ultrasound on Karonda on September 17, 1989. Dr. Fernandez observed the fetal heart for about fifteen minutes just to be absolutely certain that there was no fetal heartbeat. There was no heartbeat; the fetus was dead. Dr. Fernandez testified that she found it difficult to deter-

mine the time of death because of conflicting ultrasound findings. The ultrasound showed subcutaneous edema (i.e. fluid) in the fetus' tissue, and also the skull bones appeared somewhat overlapped. These findings are most commonly seen 24 hours or more after a fetus has died. Standing in conflict was the presence of a normal amount of amniotic fluid in the uterus, and fluid in the fetal bladder. Fluid usually disappears shortly after death. Dr. Fernandez testified that she would "be hard pressed" to say exactly when the fetus died. Her approximation was that the fetus died 24 to 48 hours prior to the 8:00 p.m., September 17, sonogram.[4]

The ultrasound did not show a tear in Karonda's placenta. Dr. Fernandez was looking for a tear in the placenta because she had been told Karonda had been kicked in the abdomen. Dr. Fernandez testified that she could have missed a very small tear in the placenta, but not a large one. A tear in the placenta causes extreme maternal pain. If the mother is in pain, and an ultrasound doesn't show a placental tear, then sometimes that means the tear is small. A small tear doesn't stay small; in a few hours it grows, and there is always bleeding. Dr. Fernandez did not see any signs of placenta abruption or hemorrhage.

After Karonda's dead fetus was delivered on September 19, 1989, Dr. Barrett Dick, a physician with a specialty in anatomic and clinical pathology, received the expelled fetus and placenta, and performed an autopsy. The autopsy reported the fetus was somewhat decomposed or macerated. The macerated fetus showed skin slippage around the head, which is typical in a macerated fetus. Dr. Dick included the placenta in his autopsy, but did not note any tears or bleeding of the placenta. On cross examination, Dr. Dick

stated placenta abruption was outside of his area of expertise.

A medical record, including slides, photographs, and the autopsy report, was sent to Dr. Enid Gilbert at the University of Wisconsin. Dr. Gilbert is a professor of pediatrics and pathology at the University of Wisconsin. Based on this record, Dr. Gilbert found a massive hemorrhage and blood clot and abruption of the placenta. "A huge hemorrhage both behind and into the substance of the placenta" "would certainly be a cause for the death of the fetus."

Based on her study of the "huge hemorrhage" Dr. Gilbert placed the time of death within 48 hours of the September 19, 5:00 p.m. delivery.[5] Dr. Gilbert testified that she was "absolutely" certain the bleeding happened "no longer than" 48 hours prior to the delivery of the fetus. Dr. Gilbert also noted the overlapping of the skull, as had all the doctors before her, but she called it "slight." Dr. Gilbert also testified to skin slippage and areas of discoloration on the fetus. She further testified that the discoloration could reflect a point of contact, as in contact from Ford's kick to Karonda's abdomen.

On cross examination Dr. Gilbert admitted that her 48 hour time of death estimate was a revised opinion. When she first received Karonda's file she wrote a letter estimating that the fetus had died 72 hours prior to delivery. She later changed her mind when she realized that 72 hours would place the death prior to Ford's kicks.

A medical record similar to the one sent to Dr. Gilbert for review was sent to Dr. William Matviuw.[6] Dr. Matviuw, a board certified obstetrician and gynecologist, found that the baby was dead with collapse of the skull and fluid (or edema) in the skin. Dr. Matviuw also testified to an absence of abruption

---

4. Dr. Fernandez's best guess as to the time of death was 24 to 48 hours. She further specified that it could have even been as early as 10 hours prior to the ultrasound. Even this short-end guess puts the fetus' death before Ford kicked Karonda.

5. When comparing Dr. Fernandez' and Dr. Gilbert's time of death estimates, note that Dr. Fernandez is counting back 48 hours prior to the time of the ultrasound whereas Dr. Gilbert is

counting back 48 hours prior to the time of delivery. The ultrasound was performed September 17, but the dead fetus wasn't delivered until September 19.

6. Dr. Gilbert did not review the ultrasound photographs, Dr. Matviuw did review the ultrasound photographs. Both doctors reviewed the autopsy report and accompanying slides and photographs.

of the placenta and an absence of hemorrhage.

Dr. Matviuw testified that he had delivered thousands of babies, and hundreds of abrupted placentas, and that he would easily be able to identify a torn placenta and the accompanying hemorrhage, but that in Karonda Marion's case, there was no such thing. Dr. Matviuw stated that the dark spot identified as a hemorrhage by Dr. Gilbert was in his opinion evidence of the fetus having been dead for some time, and having already started to decompose. In addition to drawing conclusions from the photos and descriptions of the fetus, Dr. Matviuw also included in his opinion facts about the mother. Dr. Matviuw stated that if a pregnant woman suffered a trauma severe enough to tear the placenta and kill the fetus she would necessarily experience severe pain, contractions, and vaginal bleeding. The absence of any of these symptoms in Karonda (who was at the hospital being medically monitored) negates any finding of hemorrhaging.

Dr. Matviuw placed the death of the fetus several weeks prior to the kicking incident. Dr. Matviuw also testified that Doppler fetal heartbeat findings can easily be mistaken.

### III.

■ Robert Ford's various claims for habeas relief are now properly before this court. The petitioner has two distinct types of constitutional claims: the constitutionality of the Illinois feticide statute, and the constitutionality of his conviction under that statute. The Illinois Appellate Court, Fourth District, thoroughly analyzed the Illinois intentional homicide of an unborn child provisions in light of both the equal protection and due process clauses of the United States Constitution. *See, People v. Ford,* 221 Ill. App.3d 354, 163 Ill.Dec. 766, 581 N.E.2d 1189, *passim* (1991). This court agrees with *People v. Ford* that the Illinois feticide statute is a constitutionally valid exercise of state legislative power.

■ In addition to questioning the constitutionality of the state statute, the petitioner argues that his conviction violates due process because the evidence at his trial was insufficient to prove him guilty beyond a reasonable doubt of causing the death of Karonda Marion's fetus. Under *Jackson v. Virginia,* a habeas petitioner must show that the state failed to prove him guilty beyond a reasonable doubt. 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The standard for determining the sufficiency of the evidence on habeas review is whether, after viewing evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789.

Could any rational trier of fact[7] have found the essential elements of homicide of an unborn child beyond a reasonable doubt? An essential element of homicide is that the victim was alive prior to the criminal act. Could any rational fact finder have found beyond a reasonable doubt that Karonda's fetus was alive prior to Ford's violent attack?

If any reasonable trier of fact could have found beyond a reasonable doubt that Karonda's fetus was alive at the time Ford kicked her abdomen, then this court must defer to the fact finder regardless of whether or not this court agrees with the fact finder's decision. *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789. A federal habeas court is not permitted "to make its own subjective determination of guilt or innocence." *Id.* at 319 n. 13, 99 S.Ct. at 2789 n. 13. However, if no reasonable trier of fact could have found that the fetus was alive at the time Ford kicked Karonda, then it follows that Ford could not have caused the death of the fetus, and therefore cannot be guilty of homicide.

■ The overwhelming weight of the medical testimony shows that Karonda's fetus was dead before Ford kicked her. There is no need to parse the conflicting eyewitness testimony as to how hard he kicked her, and when he kicked her, or why. Undoubtedly he did kick her, and viciously, and without

---

7. Ford's fact finder was a judge rather than a jury. "But this is of no constitutional significance." *Jackson v. Virginia,* 443 U.S. 307, 317 n. 8, 99 S.Ct. 2781, 2788 n. 8, 61 L.Ed.2d 560 (1979).

legal justification.[8] But for our purposes, the kicks are irrelevant because the evidence clearly shows the fetus was dead before Ford kicked its mother.

Dr. Fernandez, the trained specialist who took an ultrasound less than two hours after Ford kicked Karonda, found a dead fetus, a fetus that showed skull overlap and edema in the fetus' tissue, signs that the fetus had been dead for some time. Dr. Fernandez also found a normal amount of amniotic fluid, and fluid in the fetus' bladder which are signs of recent fetal life, but even with that finding the doctor placed the fetus' death at 24 to 48 hours prior to the ultrasound (or 22 to 46 hours prior to Ford's kicks). Dr. Fernandez couldn't be sure of the time of the death, but even her short-end guess of 10 hours places the death well before Ford's kicks.

Dr. Dubrick, the emergency room physician, and Dr. Matviuw, a certified obstetrician and gynecologist, also observed the ultrasound photographs. Both testified that the overlapping skull and the edema in the fetus' tissue showed a fetus that had been dead prior to Ford's September 17, 6:00 p.m. kick. Dr. Dick performed an autopsy on the dead fetus and found a decomposed or macerated fetus that had been dead long before Ford kicked Karonda.

The prosecution's theory of the case, and the theory the trial court must have accepted in order to convict Ford, is that the fetus was alive when Ford kicked Karonda in the abdomen, and that the kick caused a tear in the placenta. In turn, the tear in the placenta caused hemorrhaging and the death of the fetus. This theory is not supported by the evidence. The only evidence of a live fetus killed by a placental tear and hemorrhaging, is the revised testimony of Dr. Enid Gilbert.[9] Dr. Gilbert's testimony might be considered fairly persuasive except for the fact that her testimony at trial is in direct conflict with her first medical opinion.

On cross examination, Dr. Gilbert admitted that after first receiving Karonda's medical record she wrote a letter that placed the death of the fetus three days (72 hours) prior to the delivery on September 19. In this letter she mistakenly placed Ford's kicks three days prior to the delivery: "The placenta shows evidence of hemorrhage that extends into the placental tissue. Also large areas of fiber unseen. These changes are consistent with recent trauma and can be related to the accident or trauma that occurred three days before the delivery of the infant. Other changes seen in placenta are consistent with fetal death three days before delivery." When Dr. Gilbert realized her mistake as to the time of the kicking trauma, she revised her opinion as to the time of death, placing it 48 hours prior to delivery, i.e., the time of the kicking incident.

Dr. Gilbert contradicts herself on the crucial point in this case. In a civil case, on a motion for summary judgment, an expert is not allowed to create an issue of fact simply by changing his or her mind. *Adelman–Tremblay v. Jewel Co.*, 859 F.2d 517, 521 (7th Cir.1988). Instead, experts are held to their original statements except in a limited number of circumstances, such as to clarify ambiguity, or to reflect newly discovered evidence. *Id.* In civil cases only money is at stake. In comparison, in criminal cases, personal liberty is at stake. The stakes are much higher in criminal cases, and therefore, the court must be even more careful not to allow an unfounded change in expert testimony to alter the course of the trial.

In sum, Dr. Gilbert's second statement is inconsistent with her first. Dr. Gilbert's original written analysis of the case stated that the fetus had been dead 72 hours at the time of delivery of the fetus and placenta. This puts the fetus' death 24 hours before Ford kicked Karonda. Dr. Gilbert's original opinion was not ambivalent, nor was it un-

---

8. Ford's habeas petition claims that he acted in self defense. However, there is conflicting eyewitness testimony on this point, and it is within the fact finder's prerogative to evaluate the conflicting testimony on the issue of self defense.

9. There is nurse testimony as to a Doppler reading of a fetal heartbeat found in the emergency room. The majority of doctors testified that Doppler readings can mistakenly find a fetal heartbeat when there isn't one. Additionally, the paramedics in the ambulance tried repeatedly to locate a fetal heartbeat, but found nothing.

clear. She clearly stated that in her opinion the fetus delivered on September 19 had been dead for 72 hours. Later, she revised her testimony to 48 hours, not to clarify (for there was no ambiguity) and not based on new data or new information. She revised her opinion to make it compatible with Ford committing homicide. Her revised opinion then became the sole physician-based support for the essential element of a live fetus at the time the alleged homicide took place.

Dr. Gilbert's trial testimony stands alone as to the time of fetal death. It is also singular as to the cause of fetal death. Dr. Gilbert testifies that the placental abruption followed by hemorrhaging caused the fetus' death. She claims that the hemorrhage in Karonda's placenta would be obvious to "a blind man on a galloping horse." Unfortunately it wasn't obvious to four doctors, three who saw the ultrasound, and one who saw the deceased fetus and the expelled placenta.

Dr. Fernandez, took an ultrasound and specifically looked for a tear in the placenta, but found none. Nor did she find any bleeding. Dr. Dubrick, the emergency room physician, viewed the ultrasound and the patient and found no evidence of placenta abruption. Dr. Matviuw reviewed the entire medical record including the ultrasound, and even though he had personally delivered hundreds of abrupted placentas, he could not find an abruption in Karonda Marion's record. Dr. Dick, when performing the autopsy, examined both the fetus and the placenta, but found no tear and no hemorrhaging.

Dr. Dubrick, and Dr. Matviuw both testified that a woman undergoing placenta tearing and bleeding would have experienced intense pain and vaginal bleeding, but Karonda exhibited neither of those symptoms. During the two days between Ford's kicks and the delivery of the decomposed fetus, Karonda was in the hospital. Medical observers all agree that Karonda did not experience pain or bleeding.

Under the standard of review enunciated in *Jackson v. Virginia*, federal district courts must be careful not to intrude on the state courts' discretion as to factual matters. However, in certain rare instances, federal courts have granted the writ because the evidence before the state court was insufficient under *Jackson*.[10] This is one of those rare instances where it is the duty of the federal court to grant the writ of habeas corpus based on insufficient evidence.

This case is conceptually analogous to *Littles v. DeFrancis*, 517 F.Supp. 1137 (M.D.Ga. 1981). In *Littles* a jury found Littles guilty of murder. The district court granted habeas relief, finding that the evidence was insufficient to prove beyond a reasonable doubt that the victim died in December *as the result of* Littles shooting her in August. *Littles*, 517 F.Supp. at 1157. The evidence at trial showed the defendant shot the victim in August. This led to weakness, mental confusion and other nervous symptoms. The victim died the following December from pulmonary embolism. At trial, doctors testified there were multiple possible causes for pulmonary embolism. The defendant was convicted, but the federal court granted habeas relief because the evidence left room for a reasonable doubt as to whether the defendant's gunshot *caused* the victim's death.

Similarly, Ford's petition shows that the trial evidence leaves a reasonable doubt as to whether Ford's kicks *caused* the death of the fetus. The overwhelming weight of the evidence is that the fetus had died some time prior to the fight between Karonda and Ford. When Ford kicked Karonda the fetus inside her was already dead, and therefore

10. *See, e.g., Rhoden v. Morgan*, 863 F.Supp. 612 (M.D.Tenn.1994); *Tuggle v. Thompson*, 854 F.Supp. 1229 (W.D.Va.1994); *Halton v. Hesson*, 803 F.Supp. 1272 (M.D.Tenn.1992); *Sanders v. McMackin*, 786 F.Supp. 672 (N.D.Ohio 1992); *Pilotti v. Superintendent, Great Meadow Correctional Facility*, 759 F.Supp. 1031 (S.D.N.Y.1991); *Blankenfeld v. Clarke*, 753 F.Supp. 1498 (D.Neb. 1990); *Tenner v. Wallace*, 615 F.Supp. 40 (S.D.Ga.1985); *Watson v. Nix*, 551 F.Supp. 1 (S.D.Iowa) *aff'd*, 696 F.2d 1000 (8th Cir.1982); *Bentley v. Cox*, 508 F.Supp. 870 (E.D.Va.1981); *Littles v. DeFrancis*, 517 F.Supp. 1137 (M.D.Ga. 1981); *Stacy v. Love*, 528 F.Supp. 38 (M.D.Tenn. 1981) *aff'd*, 679 F.2d 1209 (6th Cir.1982) *cert. denied*, 459 U.S. 1009, 103 S.Ct. 364, 74 L.Ed.2d 400 (1982); *Hobson v. Murray*, 485 F.Supp. 1340 (E.D.Va.1980); *Holloway v. McElroy*, 474 F.Supp. 1363 (M.D.Ga.1979) *aff'd*, 632 F.2d 605 (5th Cir.1980) *cert. denied*, 451 U.S. 1028, 101 S.Ct. 3019, 69 L.Ed.2d 398 (1981).

there could be no intentional homicide of an unborn child.

## IV.

In summary, the court finds that the state trial court committed constitutional error. Reasonable doubt as to whether Ford's kick caused the death of the fetus must exist. Even if one looks at all the evidence in the light most favorable to the state, there is at least a reasonable doubt as to whether the fetus was alive at 6:00 p.m. on September 17. Without support for the essential element of a live victim, a homicide conviction violates due process and requires federal habeas relief.

IT IS THEREFORE ORDERED that the petition for a writ of habeas corpus be, and hereby is, allowed.

IT IS FURTHER ORDERED that the petitioner, Robert J. Ford, be discharged from custody, unless within one hundred twenty (120) days after the entry of this order, the petitioner is retried for the offense for which he is currently incarcerated.