**Robert FORD, Jr., Petitioner–Appellee,**

v.

**Rodney J. AHITOW, Warden, and Roland W. Burris, Respondents–Appellants.**

No. 95–2542.

United States Court of Appeals, Seventh Circuit.

Argued April 9, 1996.

Decided Jan. 14, 1997.

Raymond C. Perkins (argued), Winston & Strawn, Chicago, IL, for petitioner–appellee.

Steven J. Zick (argued), Office of the Attorney General, Criminal Appeals Division, Chicago, IL, for respondents–appellants.

Before EASTERBROOK, RIPPLE and KANNE, Circuit Judges.

RIPPLE, Circuit Judge.

On Sunday, September 17, 1989, around 6 o'clock in the afternoon, a violent fight erupted between the petitioner Robert Ford and Karonda Marion ("Karonda"), his stepdaughter, who was approximately five months pregnant. During the brawl, Mr. Ford kicked Karonda in the abdomen several times and Karonda stabbed Mr. Ford. Each was taken to a hospital. In the emergency room, a Doppler machine detected a fetal heartbeat but the ultrasound/sonogram did not. The radiologist concluded that the fetus was dead.

Mr. Ford was convicted in an Illinois state court of the intentional homicide of Karonda's unborn child. He was sentenced to a prison term of twenty years. The judgment was affirmed by the Appellate Court of Illinois, *People v. Ford*, 221 Ill.App.3d 354, 163 Ill.Dec. 766, 581 N.E.2d 1189 (1991), and leave to appeal to the Illinois Supreme Court was denied, *People v. Ford*, 143 Ill.2d 642, 167 Ill.Dec. 404, 587 N.E.2d 1019 (1992). However, the United States District Court granted Mr. Ford's petition for a writ of habeas corpus. *Ford v. Ahitow*, 888 F.Supp. 909, 910 (C.D.Ill.1995). It found that "the state failed to prove the petitioner guilty beyond a reasonable doubt, and therefore the petitioner's incarceration violates due process." *Id.* Concluding that Ford is in "custody in violation of the Constitution ... of the United States" pursuant to 28 U.S.C. § 2254, it granted the writ. *Id.* For the reasons discussed in the following opinion, we reverse the district court's issuance of the writ of habeas corpus.

## I

## BACKGROUND

### A. Facts

The house in which Robert Ford lived with his wife, Mary Marion, and her two daughters, Gwendalyn and Karonda, was often the scene of domestic clashes and abusiveness, one which the state trial court described as an "almost unbelievably violent environment from time to time." Tr. X at 461. Frequently Mr. Ford had disputes with his wife Mary Marion; and typically her seventeen year-old daughter Karonda would intervene. There was much enmity between Mr. Ford and Karonda. Mary Marion, Karonda and Gwendalyn each testified that, at different times, Mr. Ford had called Karonda's baby a bastard and had threatened to "knock that baby bastard," Tr. VII at 45, 105, 116, or "kick that bastard out of" Karonda. Tr. VII at 9, 14, 51, 54, 66–67, 108, 110, 122, 124. Just a month prior to the events in question, Karonda and Mr. Ford had fought on Karonda's seventeenth birthday. On that day Mr. Ford, intoxicated, had verbally threatened Karonda and her unborn baby; he then had lifted Karonda in the air and had thrown her down on the ground. Mr. Ford himself described his handling of Karonda on that occasion: "I didn't pick her up, I just grabbed

her and swung her around and, you know, like a karate lay down with, you know, just laid her down.". 8 Loose Pleadings at C 128. Following that altercation, the police held Mr. Ford at the jail overnight before releasing him.

The decisions of the Appellate Court of Illinois and the United States District Court chronicle fully the atmosphere and events surrounding the physical confrontation of September 17, 1989. See *Ford*, 888 F.Supp. at 910–16; *People v. Ford*, 163 Ill.Dec. at 768–74, 581 N.E.2d at 1191–97. When we review a habeas petition, we must accept the factual findings of the state trial and appellate courts as true because they are entitled to a presumption of correctness. 28 U.S.C. § 2254(e)(1);[1] *Sumner v. Mata*, 449 U.S. 539, 547, 101 S.Ct. 764, 769, 66 L.Ed.2d 722 (1981); *Abrams v. Barnett*, 100 F.3d 485, 487 (7th Cir.1996). We turn, therefore, to the state appellate court opinion and to the trial record and focus only on certain pivotal, essentially undisputed factual elements.

### 1. Mr. Ford's Statements

Mr. Ford agreed to two interviews conducted by Officer Jeffrey Michael Regan of the Urbana Police Department. The second was tape-recorded. Mr. Ford also testified at trial. His testimony concerning the arguments and physical fighting on September 17, 1989, in most ways parallels the testimony of others. Therefore, we begin our overview of the events of September 17, 1989, by reviewing Mr. Ford's testimony and interview statements. .

On the afternoon of September 17, 1989, Mr. Ford had been out drinking.[2] When he returned home late that afternoon, he was angry to find so many people in his house, in fact in his bedroom, drinking his alcohol and eating his food. Hoping to lie down because he was drunk, Mr. Ford threw open the door to the bedroom. He began an argument with his wife Mary Marion which turned into a physical tussle. Mr. Ford burned his wife's chest with a cigarette once or twice; he testified that he must have burned her "by accident." After Mary Marion screamed, Karonda came into the bedroom to defend her mother. She and her stepfather began arguing as well. Someone pushed Mr. Ford onto the bed; he began throwing his hands around and kicking to try to get up. Mr. Ford, wearing black combat or engineer-type boots at the time, admitted that he "may have kicked [Karonda] a couple of times" and that he probably kicked her with his "left foot 'cause [his] right foot is messed up.'" 8 Loose Pleadings at C 135; *see also id.* at C 118; Tr. VII at 159. Karonda stabbed her stepfather with a steak knife that was in the bedroom.[3]

Once he realized that he was bleeding, Mr. Ford left the house. However, the stabbing upset him; he returned swinging an automobile bumper jack, which he beat on the kitchen stove. When he went back outside, the police had arrived. Mr. Ford collapsed and was taken to Carle Hospital.

---

1. Section 2254(e) was formerly § 2254(d). It was redesignated by section 104 of the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. 104–132, 110 Stat. 1214.

2. Officer Jeffrey Michael Regan testified at trial concerning his investigation in this case. He described the two interviews he conducted with Mr. Ford on September 18 and 21, 1989, the second of which was tape-recorded. Defense counsel objected only to the relevance of his statements concerning Mr. Ford's violent conduct toward Mary Marion. He did not object to Officer Regan's description of Mr. Ford's statements concerning his treatment of Karonda.

 Mr. Ford also testified at trial. His testimony concerning the arguments and physical fighting on September 17, 1989, parallels the testimony of others—with two exceptions. At trial he claimed that the cigarette burn of Mary Marion was an accident and that he "could have kicked" Karonda out of fear that she would stab him again. Tr. X at 435. Therefore our discussion of the events of September 17, 1989, is drawn from Mr. Ford's own testimony and interview statements.

3. There was conflicting evidence concerning (1) whether Karonda had a knife in her hand when she came into the bedroom or picked up the knife that already was in the bedroom and (2) whether she stabbed Mr. Ford before or after she was kicked. Mr. Ford testified that she stabbed him first. The trial court resolved those disputes. It found that the knife was in the bedroom before Karonda entered and that Karonda was kicked before she stabbed Mr. Ford. These factual findings are not challenged.

### 2. Statements of Other Occurrence Witnesses

The descriptions given by the numerous other witnesses who saw the verbal and physical violence in the Ford house on September 18 reflected a scene of pandemonium. Several testified that Mr. Ford had stomped and kicked Karonda hard in the stomach a number of times. Karonda and other witnesses testified that he kicked her first. Many saw Mr. Ford leave the house, return with an automobile bumper jack and beat the kitchen stove with it. Karonda's mother testified that, at the same time, he was cursing Karonda and vowing to "kick that bastard" out of her. Tr. VII at 20. Karonda got a different knife, but her mother and sister took it from her. At that point, Karonda was experiencing pain in her abdomen; she collapsed and perhaps lost consciousness. When the ambulances arrived, Mr. Ford was bleeding from his stab wound; Karonda was bleeding from a cut on her wrist and had abdominal pain. Each was carried to a different hospital.

### 3. Statements of Hospital Personnel

Karonda was taken to Mercy Hospital around 7:00 p.m. She was first examined, briefly, by Dr. Anton Dubrick, the emergency room physician on duty. Then two registered nurses assessed the vital signs of Karonda and her baby. Nurses Susan Fifield and Jodi Smalley used a Doppler device to obtain a fetal heart tone.[4] Because the Doppler amplifies the sounds through a speaker, the heart beat was audible to everyone in the room.[5] The nurses monitored both the fetal and maternal heart rates. They obtained a fetal heart rate of 148 beats per minute and a maternal pulse of 120.

Nurse Smalley informed Dr. Dubrick of the results; he then palpated Karonda's abdomen and found it soft and normal. Although all the evidence indicated that Karonda and her baby were stable, on the advice of Dr. Trupin, the obstetrician-gynecologist on call, Dr. Dubrick ordered a sonogram.

Dr. Delores Fernandez, a diagnostic radiologist, viewed the ultrasound images for approximately fifteen minutes. During that time, Karonda stated that she had felt the baby moving when she was in the emergency room but had not felt it move since she had been taken to the ultrasound room. Dr. Fernandez saw no evidence in the sonogram of fetal motion or of cardiac activity. She concluded that the baby was dead. Dr. Dubrick then notified Karonda that her baby was dead. The stillborn baby was delivered two days later, at 5:31 p.m. on September 19, 1989. The autopsy report, requested by the Urbana Police Department, listed that time and date as the official time of death of the baby.

Dr. Barrett Dick, the anatomical and clinical pathologist who performed the autopsy the next morning, September 20, 1989, spent two hours and twenty minutes examining the body of the baby. Also present were eleven other aids and witnesses-assistants from histology and radiology, photographers, a secretary, and Officer Regan from the Urbana Police Department. The forensic autopsy report presents the following observations and findings:

> Our conclusions are based upon the known circumstances of death as related to us at the time of autopsy, the postmortem examination, and various laboratory studies. This stillborn fetus was the product of an estimated 22 week gestation. The mother sustained abdominal trauma during a domestic dispute with fetal heart tones ini-

---

**4.** A Doppler device or instrument is a diagnostic instrument that emits an ultrasonic beam into the body. The ultrasound reflected from moving structures changes its frequency. *Stedman's Medical Dictionary* at 517, 26th ed., Williams & Wilkins (1995). The instrument is used to amplify pulse signals within a blood vessel as well. *The Sloan–Dorland Annotated Medical–Legal Dictionary, 1992 Supplement* at 208, West Pub. Co. (1992).

**5.** After applying an electrode jelly to Karonda's abdomen, the nurses placed the Doppler transducer on Karonda's abdominal wall and moved it from side to side to pick up the sound of the fetal heart tones in the abdomen. Nurse Fifield described the sound as "a short staccato-type heartbeat much louder and more distinct than a mother's heartbeat." Tr. VIII at 223. In contrast, she characterized the sound of a mother's heartbeat as "similar to a whooshing sound like water or air through a tunnel or a tube." *Id.*

tially noted then later disappearing. The dead fetus was delivered two days later. At postmortem examination, no structural abnormalities were noted in the fetus or the placenta. The fetus was noted to be somewhat macerated, consistent with intrauterine death. The tissues were noted to be very pale and also had no hemoglobin staining. This suggested that the baby was very anemic but no cause of this could be demonstrated. Specifically, no source of bleeding was noted on examination of the fetus and the placenta, and no evidence of feto-maternal hemorrhage was found based on the acid elution test on maternal blood.

8 Loose Pleadings at C 367. Dr. Dick declined to offer his opinion as to the cause of death. He stated that the cause was "undetermined with a suggestion of blood loss inferred because of marked paleness of the tissue and lack of hemoglobin staining." *Id.* at C 367, 372. In his summary, Dr. Dick stated that the ultrasound was "interpreted as having suggestion of fetal skull fracture with overlap of the fetal skull bones." *Id.* at C 374. The pathologist also explained that the data were based on the dissection and microscopic examination of the important organs; his detailed review of each organ and body part led him to conclude that no structural abnormalities were found. *Id.* at C 381–86.

### B. *The Indictment*

The indictment against Mr. Ford charged him with the intentional homicide of the unborn child of his stepdaughter Karonda Marion. The statute provides:

Sec. 9–1.2(a) A person commits the offense of intentional homicide of an unborn child if, in performing acts which cause the death of an unborn child, he without lawful justification:

(1) either intended to cause the death of or do great bodily harm to the pregnant woman or her unborn child or knew that such acts would cause death or great bodily harm to the pregnant woman or her unborn child; or

(2) he knew that his acts created a strong probability of death or great bodily harm to the pregnant woman or her unborn child; and

(3) he knew that the woman was pregnant.

. . .

(d) Penalty. The sentence for intentional homicide of an unborn child shall be the same as for first degree murder, except that the death penalty may not be imposed.

720 ILCS 5/9–1.2 (formerly Ill.Rev.Stat. Ch. 38 ¶ 9–1.2).

### C. *The Trial*

On June 5, 1990, a bench trial before the Honorable Harold L. Jensen commenced in the Circuit Court of Champaign County, Illinois. Prior to trial, counsel for the defense stated that he intended to show that Mr. Ford acted in self defense and that Karonda Marion had been carrying a dead fetus, one that had died previously from causes unrelated to Mr. Ford's assault. The occurrence witnesses—all the family and friends who were in the Ford house on September 17, 1989 and the police officers who arrived at the scene-testified, presenting the scene described in the facts above from their various perspectives. Their testimony went to prove whether Mr. Ford had committed the offense of intentional homicide of an unborn child or whether he was acting in self defense. The state and Mr. Ford each presented medical experts whose testimony was offered to show whether his acts caused the death of the unborn child or whether the baby was already dead.

The State's first expert medical witness at trial was Dr. Enid Gilbert, a professor of pediatrics and pathology at the University of Wisconsin who is board certified in pathology, anatomical pathology, clinical pathology and pediatrics. Dr. Gilbert examined the medical records of Karonda's fetus, including reports, photographs and microscopic slides,[6] and stated her opinion as to the cause of death:

---

6. Apparently Dr. Gilbert did not view the sono-

gram or photographs from the sonogram.

I believe that due to the impact to the abdomen an abruption of the placenta occurred causing massive hemorrhage both behind the placenta, separating the uterus or womb from the placenta, and hemorrhage actually into the placenta. This was a massive hemorrhage which would have precluded normal blood flow to the fetus and would result in the death of the baby.

Tr. VIII at 183. Dr. Gilbert examined People's exhibit number 12, the color photograph of the placenta's maternal surface (the side of the placenta ordinarily attached to the uterus). Dr. Gilbert testified that the dark black color on the placenta "represents a huge hemorrhage both behind and into the substance of the placenta." *Id.* at 184. She further testified that the hemorrhage was "a quite fresh-looking blood clot," *id.* at 185, and concluded that the clot had formed "within 48 hours of the time that the placenta was delivered." *Id.*

Dr. Gilbert also reviewed the photograph of the fetal skull, People's exhibit number 13. The physician testified that, after fetal death, the brain liquifies and the skull bones collapse and overlap. In this case, however, she testified, the overlapping of the skull bones was minimal and death had not been present for more than 48 hours. After examining People's exhibit numbers 14 and 15, photographs of the body of the fetus, Dr. Gilbert described skin slippage, a peeling of the skin that occurs 24 hours after fetal demise. She then testified that skin slippage is very evident by 48 hours after death and it "looks exactly as you see in these pictures." Tr. VIII at 190. She also noted that some areas of discoloration on the baby's trunk "may have been related to the impact of the blow that was received on the abdomen." *Id.* at 190, 194. In addition, she explained that the paleness of the fetal tissues and lack of hemoglobin staining were the result of the blockage of circulation to the fetus caused by the maternal hemorrhage.

Dr. Gilbert testified that the open eyes of the fetus confirmed a gestational age of between 22 and 24 weeks. Moreover, the sonogram's detection of a full fetal bladder indicated a recent death because the bladder of a fetus evacuates soon after death-usually within four hours and sometimes within as little as thirty minutes of death. It was Dr. Gilbert's opinion that none of the medical records she had received presented any evidence inconsistent with her belief that the baby was alive prior to the injury Karonda received on September 17. She commented that the pale fetal tissue and lack of hemoglobin staining noted by Dr. Dick, the pathologist, were further evidence of a massive maternal hemorrhage into and around the placenta and of the subsequent blockage of blood flow from the maternal circulation to the fetus' circulation. Dr. Gilbert opined that Dr. Dick simply had neglected to examine the placenta in detail, but that she was certain he would amend his opinion if he were shown the photograph at issue. When asked why the sonogram did not find the hemorrhage, she deduced that there may have been little evidence of the abruption so soon after Karonda sustained the trauma to her abdomen.

On cross-examination Dr. Gilbert was presented with a letter she had written to Detective Regan, the investigator on the case, stating that fetal death had occurred 72, rather than 48, hours before delivery. She responded that her subsequent detailed review of the entire record led to her present revised opinion that the fetal death occurred within 48 hours of the delivery, and could not have occurred 72 hours before delivery. She acknowledged her awareness that the autopsy showed no evidence of bleeding of the fetus or the placenta, but testified that, in her opinion, the pathologist must have overlooked the massive, recent hemorrhage in the placenta. She further opined that, if the pathologist were shown the photograph (People's exhibit number 12), "he would amend his opinion as stated." *Id.* at 200. Dr. Gilbert noted, as well, that the fact that the pathologist conducting the autopsy recognized many of the fetal tissues and organs indicates that death had occurred within 48 hours, before autolysis would cause the fetus to disintegrate. The doctor testified that "there is so much evidence that points to almost an exact time of the death of this fetus that I think it's incontrovertible evidence." *Id.* at 211. When asked on redirect examination to explain what caused her to

amend her opinion as to the time of death from 72 to 48 hours, Dr. Gilbert testified that she had re-examined the slides and photographs and had concluded that the hemorrhage had been very recent and that, if death had occurred 72 hours rather than 48 hours earlier, there would have been more overlapping of the sutures or skullbones.

Next to testify were the two registered nurses in the emergency room who assessed the vital signs of Karonda and her baby. One had been a registered nurse seven years; the other had nine years of experience. Each one explained the use of the Doppler device in the procedure performed on Karonda to listen to the fetal heartbeat, and each stated that she had no doubt that what she heard was a fetal heartbeat.

Also testifying for the state was Dr. Barrett Dick, the pathologist specializing in anatomic and clinical pathology who conducted the autopsy on the fetus. He testified at trial that he found the fetus somewhat decomposed or macerated, pale, and without anatomic lesions. He explained that he was looking for sources for the pale fetus' loss of blood. He considered whether there had been bleeding from the umbilical cord into the fetal surface of the placenta or into the maternal circulation and concluded that "no source of bleeding was noted on examination of the fetus and the placenta and no evidence of fetal maternal hemorrhage." Tr. VIII at 241. When he was asked on cross-examination to examine the photograph of the maternal surface of the placenta (People's exhibit number 12), Dr. Dick agreed that he had disregarded the importance of that view of the placenta. He also admitted that he had no expertise to determine whether the photograph was evidence of abruption of that placenta or just maternal bleeding. He stood by his conclusion that the cause of death was undetermined but that the inferred cause was blood loss due to unknown factors. He also testified that he had no basis for disagreeing with Dr. Gilbert's findings.

Dr. Fernandez, the diagnostic radiologist who performed the ultrasound on Karonda and interpreted the sonogram results, concluded that there was no fetal heartbeat. However, she testified that she was unable to determine the time of death, within a reasonable degree of medical certainty, because of conflicting indicia in the ultrasound. She stated that the overlap of the fetal skull bones indicated either that the fetus had received a direct trauma to the head, resulting in a skull fracture, or that the fetus had expired more than 24 hours prior to the sonogram and the brain was dehydrated and the skull was collapsing. Dr. Fernandez listed several indications from the ultrasound images that the fetus had died within the past 48 hours: the normal amount of amniotic fluid in the uterus, the presence of fluid in the fetal bladder and stomach, the subcutaneous edema which appears within several hours to one day after fetal demise. She then testified that the "closest approximation [she] could make is ... that this baby probably died within 24 to 48 hours of the study or earlier." Id. at 260. On cross-examination the radiologist stated that, although there was no sonographic evidence of placental abruption and no visibly large hematoma or tear in the placenta, a subtle tear could have been missed and would have been evident in another sonogram taken hours later. Dr. Fernandez concluded her testimony by stating that she saw no definite evidence of abruption of the placenta. Following her testimony, the state rested.

Mr. Ford's first medical witness was Michael Smith, the ambulance paramedic who was dispatched to the Ford residence. After treating the laceration on Karonda's wrist to control the bleeding, he assessed Karonda's vital signs, checked for hemorrhages and gave her oxygen. He then turned to an assessment of the fetus. When he palpated Karonda's abdomen, she felt moderate pain. Using his stethoscope, the paramedic listened for fetal movement or heart beat; he could not locate those sounds. However, he told the court that the Doppler device was a more sensitive way of getting fetal heart tone, and explained to Karonda that he was not as well equipped in the ambulance as a hospital would be. Mr. Ford also presented medical evidence from three physicians.[7]

7. Dr. Camilla Parham, the family practice physi- cian, verified that Karonda had been pregnant

Dr. Anton Dubrick, the hospital physician certified in emergency medicine who first attended Karonda, examined her briefly and found she was upset emotionally but not in pain. After the nurses heard the fetal heart tone, the physician palpated Karonda's abdomen and found that it was normal. Nevertheless, on the recommendation of the gynecologist on call, Dr. Dubrick sent Karonda for a sonogram. When the radiologist reported there was no fetal heartbeat, Dr. Dubrick testified, he was surprised. He looked at the real-time or actual sonogram images on the screen, but did not have the ability to make findings from the sonogram.

Dr. Dubrick testified that there was room for error in determining a fetal heart tone and that it was possible that a mistake was made in this case. According to Dr. Dubrick, "the classic signs on sonography of a fetus that has been dead for some time [are] overlapping skull bones and . . . edema of the abdominal wall and torso." Tr. IX at 300–01. He testified that he "found out that a very broken down, macerated infant was delivered two days later," *id.* at 301, and concluded that such a fetus could not have been alive an hour before he viewed the sonogram.

On cross-examination, Dr. Dubrick admitted he was unable to inform the court when skin slippage begins after a fetus has died. He did not know the significance, when formulating an estimated time of death, of the fetus' full bladder or stomach or of the normal amount of amniotic fluid in the womb. Dr. Dubrick also stated that he had no expertise to evaluate the fact that the fetus' internal organs were identified during the autopsy.

Dr. William Matviuw, a board certified gynecologist and obstetrician in private practice, reviewed the medical record in this case and concluded that there was no evidence of a crushing injury to Karonda's uterus on September 17, 1989. He testified that the sonograms he examined led him to five findings: The baby was dead; the skull had collapsed (an event occurring at least two weeks after death); the head and abdominal

skin were swollen with fluids coming in through the skin (an event occurring no less than one or two weeks after death); the fetus' maturity, as determined from the measurements of the long bones, was 20.3 weeks (an indication that the baby had died 4 weeks prior to this incident); and there was no evidence of abruption of the placenta.

Dr. Matviuw testified he placed no significance in the fact that the fetal bladder was full. He explained that, if urine is in the bladder when the fetus dies, "there's no way the baby can expel the urine afterwards." Tr. X at 409. He testified that the brownish liquid that was expelled before delivery indicated that the fetus had been decomposing in his own fluid for two to three weeks. Dr. Matviuw also testified that the absence of blood clots during delivery of the fetus and placenta indicated no hemorrhaging.

When the physician examined People's exhibit number 12, the color photograph of the placenta, he testified that there was no blood clot but rather a dying placenta in which the blood had started to break down. After examining People's exhibit number 13, he stated that no one could draw a conclusion from the photograph concerning any skull overlap because the skull was being held or cradled. Dr. Matviuw also testified that the Doppler device can be mistaken when searching for a fetal heart tone and that fetal death can be diagnosed only with real time ultrasound. He concluded, after consultation with another physician, that there was no evidence of abruption. In Dr. Matviuw's opinion, the evidence indicated that degeneration of the placenta had been occurring for several weeks. He stated his clinical judgment that the baby had died several weeks prior to Karonda's hospitalization. Although he could not determine the cause of death of Karonda's fetus, Dr. Matviuw expressly excluded the trauma Karonda received on September 17, 1989, as the cause of death. In fact, he testified that the trauma was "inconsequential, not in any way related to any of the facts." Tr. X at 422.

On cross-examination, Dr. Matviuw stated that he had six months of training in patholo-

and that, at Karonda's prenatal examination on August 11, 1989, the baby's gestation had been

estimated at 20 weeks.

gy and had performed a few autopsies 20 or 25 years ago; however, he was not board certified in pathology. He admitted that he had not determined fetal death for "a few years" and reviewed pathology reports on dead fetuses only once or twice a year. He also testified that the heart beat of a 20–24 month fetus would normally be between 110 and 150 beats per minute.

### D. Illinois Trial Court Ruling

At the conclusion of this bench trial, Mr. Ford was found guilty of the charge of intentional homicide of an unborn child, 720 ILCS 5/9–1.2. The court made specific findings with respect to each element of the offense. It found that Mr. Ford knew that Karonda Marion was pregnant and that he kicked or stomped Karonda before Karonda stabbed Mr. Ford.[8] The trial court then concluded that the evidence could not support Mr. Ford's assertion that he was using reasonable force to defend himself.[9]

The trial court turned to the question whether Mr. Ford's actions caused the death of Karonda's fetus. It noted certain undisputed facts about Karonda: She collapsed shortly after being kicked in the bedroom; she complained of pain in her abdomen as well; and she testified that she felt the baby move, at least once, in the emergency room, and that she had felt the baby move in the weeks before September 17. Moreover, the court pointed out, the two nurses administering the Doppler device "were unequivocal in their conclusion that they heard a fetal heart tone." Tr. X at 467.

According to the court, Dr. Fernandez, the radiologist who read the sonogram, was surprised to find skull slippage, evidence which was inconsistent with other evidence indicating that the fetus died "within a short period of time-perhaps even less than a half hour" of the Doppler reading. Id. It noted Dr. Gilbert's opinion that the fetus had very recently died, within 24 to 48 or 72 hours of the delivery of the fetus. The court recognized the concern of the emergency room physi-

cian, Dr. Dubrick, that mistakes could be made in determining fetal heart tone using the Doppler device. Nevertheless, because Dr. Dubrick twice stated that those matters were not within his area of expertise as an emergency room physician, the court did not place much weight on his testimony with respect to the cause and time of death. The court then turned to the testimony of Dr. Dick, the pathologist who performed the autopsy. It found significant Dr. Dick's statement that he had no basis for disputing Dr. Gilbert's opinion and that some of the issues were not within his field of expertise. Moreover, the testimony of Dr. Matviuw was discounted because it was "inconsistent, basically with most of the other medical evidence in this case." Id. at 471.

After reviewing all the evidence and medical opinions, the court posed the essential issue: "Is there a reasonable doubt about the time of death?" It then resolved the question succinctly:

The time of death occurred sometime between when Karonda was first brought to the emergency room and when the sonograms were taken, then there's no doubt in my mind about the cause of death.

The court then concluded:

... I have to conclude that I do not have a reasonable doubt. And I find that the defendant specifically knew that Karonda Marion was pregnant, and that he did, without lawful justification, and with the knowledge that his acts created a strong probability of death to the unborn child of Karonda Marion, kicked Karonda Marion in the abdomen with his foot, thereby causing the death of the unborn child carried by Karonda Marion as charged in Count VII of the indictment; and judgment is entered on the finding.

Tr. X at 471.

### E. Determination of Illinois Appellate Court

In People v. Ford, 221 Ill.App.3d 354, 163 Ill.Dec. 766, 581 N.E.2d 1189 (1991), the state

---

8. The court noted that "[t]he fact of the kicking is really not disputed," Tr. X at 463, and that "Mr. Ford's own statement to Investigator Regan concedes that he kicked Karonda Marion." Id. at 464.

9. The court also noted that "Mr. Ford may have contemplated that kind of aggressive action based on remarks that others testified to [sic] he's made to Karonda about kicking the child out of her stomach." Tr. X at 464.

appellate court affirmed Ford's conviction and sentence. The court gave a plenary summation of the underlying facts and addressed fully Mr. Ford's contentions. It then held that the fetal homicide statute does not violate the equal protection clause and is not unconstitutionally vague and ambiguous.

According to the state appellate court, the trier of fact was required to determine whether the fetus "once had life and, because of the acts of the defendant, no longer does." *Id.* at 778, 581 N.E.2d at 1201. It held that, despite Mr. Ford's assertion to the contrary, there was sufficient proof of his guilt: "The evidence in this case was sufficient to prove beyond a reasonable doubt that defendant knew Karonda was pregnant, had the requisite criminal intent to cause the death of her unborn child, and that the fetus was alive prior to his actions on September 17 and thereafter expired." *Id.* at 779, 581 N.E.2d at 1202.

F. *Determination of United States District Court*

In *Ford v. Ahitow,* 888 F.Supp. 909 (C.D.Ill.1995), the district court granted Mr. Ford's petition for writ of habeas corpus. The court began with the principle that the "essential element of homicide is that the victim was alive prior to the criminal act." *Id.* at 914. After summarizing the evidence presented, the court stated the standard for reviewing a habeas petition as set forth in *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979): A petitioner is required to show that the state failed to prove him guilty beyond a reasonable doubt. It recognized that, under *Jackson,* it must view that evidence in the light most favorable to the prosecution, and may not make a subjective determination of the facts on its own. *Id.* It then concluded that the "overwhelming weight of the medical testimony shows that Karonda's fetus was dead before Ford kicked her." *Id.*

The court demonstrated the overwhelming weight of that evidence by referring to the testimony of Drs. Fernandez, Dubrick and Matviuw, who found that the skull overlap and edema in the fetus' tissue showed that the fetus had been dead for some time. The court next explained that "the theory the trial court must have accepted in order to convict Ford, is that the fetus was alive when Ford kicked Karonda in the abdomen, and that the kick caused a tear in the placenta." *Id.* at 915. However, according to the district court, Dr. Gilbert offered the only physician-based evidence that a live fetus had been killed by a placental tear and hemorrhaging, and her testimony was discredited because her trial testimony was in direct conflict with her first medical opinion. The district court stated that Dr. Gilbert contradicted herself on the crucial point in the case and that her change of opinion from 72 to 48 hours was done "not to clarify ... and not based on new data or new information ... [but] to make it compatible with Ford committing homicide." *Id.* at 916. The court concluded that the prosecution's theory was not supported by the evidence. It also pointed out that Dr. Gilbert's claim—that the hemorrhage in Karonda's placenta was obvious—"wasn't obvious to four doctors, three who saw the ultrasound, and one who saw the deceased fetus and the expelled placenta." *Id.* In light of the overwhelming evidence that the fetus had died some time prior to the fight between Karonda and Ford, the court decided that "[t]his is one of those rare instances where it is the duty of the federal court to grant the writ of habeas corpus based on insufficient evidence." *Id.*

> Reasonable doubt as to whether Ford's kick caused the death of the fetus must exist. Even if one looks at all the evidence in the light most favorable to the state, there is at least a reasonable doubt as to whether the fetus was alive at 6:00 p.m. on September 17. Without support for the essential element of a live victim, a homicide conviction violates due process and requires federal habeas relief.

*Id.* at 917. The district court ordered that the petition for writ of habeas corpus be allowed.

II

DISCUSSION

A.

The standard by which we review habeas petitions has undergone significant

changes while this case has been under consideration. On April 24, 1996, while Mr. Ford's appeal was under advisement, the Antiterrorism and Effective Death Penalty Act of 1996 came into effect with a stroke of the Presidential pen. Pub.L. 104–132, 110 Stat. 1214. Among other changes, the new law amends 28 U.S.C. § 2254(d), the habeas statute under which Mr. Ford seeks relief. It requires federal courts "to give greater deference to the determinations made by state courts than they were required to do under the previous law." *Emerson v. Gramley,* 91 F.3d 898, 900 (7th Cir.1996). Specifically, the new § 2254(d) establishes that greater deference be accorded state court determinations:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). This amendment applies to pending cases. *Bocian v. Godinez,* 101 F.3d 465, 471 (7th Cir.1996) (citing *Lindh v. Murphy,* 96 F.3d 856, 861–67 (7th Cir. 1996), *cert granted in part,* 117 S.Ct. 726 (1997)); *McCain v. Gramley,* 96 F.3d 288, 290 n. 2 (7th Cir.1996). Under the amended § 2254(d)(1), a petitioner seeking a writ of habeas corpus "must show that the state court's decision was contrary to clearly established caselaw by the Supreme Court, or alternatively, that the state court's decision was an unreasonable application of Supreme Court caselaw." *Bocian,* 101 F.3d at 471 (citing *Lindh,* 96 F.3d at 868–69). Section 2254(d)(2) offers a different approach: The petitioner must show that the state court's decision was based on an unreasonable deter-

mination of the facts in light of the evidence presented.

As we have already noted, Mr. Ford based his petition on the claim that there was insufficient evidence of guilt; the controlling Supreme Court precedent for that claim is *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The district court, persuaded that Mr. Ford should prevail under *Jackson,* granted his habeas application. Although the state has supplied us with a copy of our decision in *Lindh,* it has made no attempt to submit any argument to us with respect to the application of the new statutory criteria in cases raising sufficiency of the evidence as the basis for relief. This case therefore is an inappropriate occasion for us to engage in extensive analysis of that topic. Suffice it to say, as the following paragraphs demonstrate, the state courts were not unreasonable in their application of *Jackson;* nor was the decision of the state court based upon an unreasonable determination of the facts based on the evidence submitted at trial. Indeed, even under the standard prevailing at the time of the filing of the habeas petition, the state court committed no error warranting habeas relief. Its decision demonstrates a correct reading of federal precedent and is amply grounded in the record.

### B.

The district court granted the writ on the ground that the evidence at Mr. Ford's trial was insufficient to prove his guilt beyond a reasonable doubt of causing the death of Karonda Marion's fetus. "[I]f no reasonable trier of fact could have found that the fetus was alive at the time Ford kicked Karonda, then it follows that Ford could not have caused the death of the fetus, and therefore cannot be guilty of homicide." *Ford,* 888 F.Supp. at 914. We begin our review of that judgment by considering the submissions of the parties.

The State asserts that the district court engaged in an intrusive level of review in this habeas proceeding, for it did not follow the *Jackson* standard. It neither viewed the evidence in the light most favorable to the prosecution nor determined whether "*any*

rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789. Instead, the State contends, the district court reweighed the evidence and refused to defer to the state trial court's evaluation of conflicting opinions and credibility determinations. The State notes specific evidence that indicated a viable fetus—Karonda's testimony that she felt a kick in the emergency room, the nurses' testimony that they heard the fetal heartbeat and Dr. Gilbert's opinion that death had occurred within 48 hours of delivery. It also criticizes the medical experts who testified that the baby had died earlier. The State submits that a rational trier of fact could have found, among the various conflicting theories on the time of fetal death, credible evidence to support the conclusion that the fetus was alive at the time of the attack and expired as a direct result of the petitioner's actions.

Mr. Ford responds that habeas corpus relief was properly granted; he claims he was wrongly convicted of murdering an unborn baby despite the fact that the baby had died before he kicked the mother in the abdomen. According to Mr. Ford, the State failed to prove that the baby was alive and that Ford's actions caused the death. He discusses in detail such medical evidence as subcutaneous edema and skull overlap, evidence which, he claims, proves that it was "physiologically impossible" for the fetus to have been alive when Ford kicked Karonda. Pet'r Br. at 13. Mr. Ford criticizes the trial court's reliance on Dr. Gilbert, who changed her opinion concerning the time of fetal death from 72 to 48 hours before the delivery of the fetus— "which conveniently placed it at almost the exact time the incident occurred with Mr. Ford." *Id.* at 17. According to the petitioner, the sonogram evidence, the "medical evidence that revealed that the fetus did not have a brain or intact body at the time of the incident," *id.* at 20, was dispositive and conclusive in this case. Dr. Gilbert's opinion, formed without the benefit of that sonogram evidence, was, in Mr. Ford's view, "in direct conflict with the basic laws of nature and medical science." *Id.* Mr. Ford also asserts that, even if the fetus had been alive, the cause of its death was not proven. He con-

tends that Dr. Gilbert's theory—that Mr. Ford's kicks caused an abruption of the placenta resulting in a massive hemorrhage which caused the death of the fetus—was not supported by the other doctors, who did not find abruption or hemorrhaging, or by Karonda herself, who did not experience intense pain, contractions or bleeding. Mr. Ford concludes that Dr. Gilbert's opinion was wrong and that "the testimony of Karonda and the nurses directly conflicts with the laws of nature, well-known laws of medical science, and the unrefuted medical evidence of this case." *Id.* at 26. Therefore, submits Mr. Ford, their testimony was properly rejected by the district court and its grant of the writ should be affirmed.

### C.

 "The Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime of which he was charged." *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970). Once an accused has been convicted and reviewing courts uphold that conviction, a federal court engaged in collateral review of the state conviction must make the all-too-familiar determination set forth in *Jackson v. Virginia:*

> [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

443 U.S. at 319, 99 S.Ct. at 2789. However, in *Jackson,* the Court made clear that the responsibility for resolving conflicts in the testimony, for weighing the evidence and for drawing reasonable inferences from basic facts to ultimate facts, is indeed the domain of that trier of fact:

> Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution.

*Id.* Therefore the role of an appellate court is quite limited; it cannot reweigh the evidence or substitute its judgment for that of the factfinder. *United States v. Ross,* 77 F.3d 1525, 1542 (7th Cir.1996).

■ The state is required to prove all the elements of each offense. *United States v. Billops,* 43 F.3d 281, 284 (7th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1389, 131 L.Ed.2d 241 (1995); *United States v. Hatchett,* 31 F.3d 1411, 1424 (7th Cir.1994). Although it need not exclude every reasonable hypothesis of innocence, *Brumley v. Detella,* 83 F.3d 856, 862 (7th Cir.1996), the quantum of evidence it proffers must be sufficient to justify a finding of guilt, with respect to each and every element of the crime charged, beyond a reasonable doubt. *See Hatchett,* 31 F.3d at 1424. On direct appeal, however, reversal of the conviction "is warranted 'only when the record is devoid of any evidence, regardless of how it is weighed, from which a jury could find guilt beyond a reasonable doubt.'" *Ross,* 77 F.3d at 1542.

As the Court explained later, in *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986), the nature of the inquiry in *Jackson,* in which the trial judge asks whether a reasonable jury could find guilt beyond a reasonable doubt, is no different from the consideration of the trial judge's inquiry in a motion for summary judgment or for a directed verdict. In that context, the judge asks whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. In both cases, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." 477 U.S. at 252, 106 S.Ct. at 2512. *See also United States v. Sherlin,* 67 F.3d 1208, 1214 (6th Cir.1995) (explaining that, under *Jackson,* substantial evidence is "more than just a scintilla.... 'It means such relevant evidence as a reasonable mind might accept to support a conclusion'") (quoting *United States v. Martin,* 375 F.2d 956, 957 (6th Cir.1967), *cert. denied,* —— U.S. ——, 116 S.Ct. 795, 133 L.Ed.2d 744 (1996)).

The district court stated that it was applying the *Jackson* standard in its review of Mr.

Ford's petition. However, our review of the record, along with the district court's opinion, leads us to conclude that the district court did not accept "the authority of the factfinder to make conclusions from the evidence." *Schlup v. Delo,* 513 U.S. 298, ——, 115 S.Ct. 851, 870, 130 L.Ed.2d 808 (1995) (O'Connor, J., concurring). In *Schlup,* the Court explained that, under *Jackson,* "the assessment of the credibility of witnesses is generally beyond the scope of review," and "the use of the word 'could' focuses the inquiry on the power of the trier of the fact to reach its conclusion." 513 U.S. at ——, 115 S.Ct. at 868. The Court characterized the essence of *Jackson:* "[U]nder *Jackson* the mere existence of sufficient evidence to convict would be determinative of petitioner's claim." *Id.*

■ In this case, there was a great deal of medical evidence, but it was conflicting. Several physicians expressly stated their inability to make a final determination as to the time or cause of death; several others chose the factors in the medical evidence that they thought were most critical to the determination and drew their conclusions on that basis. It was the appointed role of the state trial judge, the trier of fact in this case, to weigh all the conflicting evidence and to reach a resolution. Because we accept the factual findings of the state trial and appellate courts as presumably correct, as we must under 28 U.S.C. § 2254(e), we have no hesitation in concluding that the trial court did not act irrationally in finding the defendant guilty beyond a reasonable doubt. *See Herrera v. Collins,* 506 U.S. 390, 402, 113 S.Ct. 853, 861, 122 L.Ed.2d 203 (1993) ("[T]he *Jackson* inquiry does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit."). It was not irrational to find credible Karonda's testimony that she felt the baby kicking in the emergency room, the nurses' unequivocal testimony that they each heard the fetal heartbeat, and Dr. Gilbert's medical opinion, based on detailed and thorough consideration of the evidence before her, that the fetus died within 48 hours of delivery.

Mr. Ford insists that the sonogram was conclusive evidence that the fetus was already dead. Notably, however, Dr. Gilbert was the only witness to discuss, with any thoroughness, the sonogram's usefulness. She testified:

> Ultrasonography is a tool that is used to determine these factors (detecting the position of the fetus and certain abnormalities in the fetus and the placenta), but it is not the ultimate. The pathology is the ultimate diagnosis and it is not infrequent that there are pitfalls in ultrasonography.... [I]t's not 100 percent reliable, although it is an extremely useful and very valuable tool. The pathologist sees the end result and the absolute evidence.

Tr. VIII at 188.

■ The trial judge focused on the evidence offered, considered the testimony of all the witnesses concerning the cause and time of death of the fetus, weighed the inconclusive and conflicting evidence, and ruled unequivocally: The baby died while Karonda was in the emergency room and Ford's kicking of Karonda without a doubt was the cause of the fetus' death. When a habeas reviewing court considers such evidence, it must view it in the light most favorable to the prosecution and must ask whether any rational trier of fact could have found the essential elements beyond a reasonable doubt. *Brumley*, 83 F.3d at 864 (applying *Jackson* and citing cases). It cannot choose the evidence it prefers to emphasize or make its own credibility determinations. It cannot mischaracterize the testimony of certain witnesses.[10] *See Herrera*, 506 U.S. at 400, 113 S.Ct. at 860 ("[F]ederal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution—not to correct errors of fact."). In this case, however, the district court incorrectly applied the *Jackson* standard of review. We conclude that the district court's improper refusal to view the evidence in the light most favorable to the

prosecution led to its incorrect granting of the petition for writ of habeas corpus.

Mr. Ford raises one other point. He submits that, even if the baby had been alive when he kicked the mother's abdomen, the cause of its death was not proven. Once again he criticizes the evidence before the trial court and implies that Dr. Gilbert's opinion that there was a massive hemorrhage which caused the death of the baby was not credible because the other doctors did not find an abruption or hemorrhaging. On this issue, however, the district court declined "to parse the conflicting eyewitness testimony as to how hard he kicked her, and when he kicked her, or why." *Ford*, 888 F.Supp. at 914. The district court also determined that he was not acting in self defense: "[T]here is conflicting eyewitness testimony on this point, and it is within the fact finder's prerogative to evaluate the conflicting testimony on the issue of self defense." *Id.* at 915 n. 8. The district court upheld the state trial court's determination that Mr. Ford intended the harm to the fetus: "Undoubtedly he did kick her, and viciously, and without legal justification." *Id.* at 914–15.

■ The state had to prove that his "act was, beyond a reasonable doubt, a contributing cause to a death such that the death did not result from a source unconnected with the defendant's act." *People v. Campos*, 227 Ill.App.3d 434, 169 Ill.Dec. 598, 609, 592 N.E.2d 85, 96 (1992) (upholding defendant's conviction for intentional homicide of an unborn child, despite the fact that the fetus died during a "spontaneous abortion" which did not exclude unknown causes of death and commenting that extensive medical testimony was not always needed to demonstrate the causal relationship). There can be no question that the state met its burden of proof.

### Conclusion

Viewed in the light most favorable to the prosecution, as *Jackson v. Virginia* requires,

---

10. The court stated, in its presentation of the facts, Dr. Gilbert's first opinion was that the baby had died 72 hours prior to delivery, but that "[s]he later changed her mind when she realized that 72 hours would place the death prior to Ford's kicks." *Ford*, 888 F.Supp. at 913. This is a mischaracterization of Dr. Gilbert's testimony. She testified that her first statement was not erroneous, but that, on further review and examination of the record, she realized that the more accurate time frame was 48 hours or less.

the evidence was sufficient to support the state trial court's judgment of guilt beyond a reasonable doubt. There is no basis for habeas relief. Accordingly, the judgment of the district court is reversed.

REVERSED.